ANNA BELLE WIGGINS v. JAMES PIVER

No. 51

(Filed 6 January 1970)

1. Physicians and Surgeons § 11— degree and application of skill

A physician or surgeon must possess the degree of professional learning, skill and ability which others similarly situated ordinarily possess, and even though he possessees such qualifications, he must exercise reasonable care and diligence in the application of his knowledge and skill to the patient's case.

2. Physicians and Surgeons §§ 15, 17; Evidence § 50— malpractice — expert medical testimony — "same locality" rule — "similar locality" rule

In this action for damages allegedly resulting from defendant surgeon's negligent surgical treatment of plaintiff in a Jacksonville, N. C., hospital, testimony by plaintiff's expert medical witness relating to good surgical practice for a simple operative procedure, closing shallow incisions after removing a small amount of tissue, was not rendered incompetent because the witness was not familiar with the actual practice in Jacksonville, if the witness was familiar with practice in similar communities around Winston-Salem, the "same locality" rule no longer being the standard by which to judge a doctor's procedures.

ON petition for certiorari, this Court ordered the appeal docketed in the Supreme Court without prior review by the Court of Appeals.

The plaintiff appealed from judgment of compulsory nonsuit entered by Cahoon, J. at the March 31, 1969 Civil Session, Onslow Superior Court.

The plaintiff, Mrs. Anna Belle Wiggins, instituted this civil action against Dr. James Piver. The summons was issued and the complaint was filed on March 30, 1966. In the complaint, the plaintiff alleged that on January 25, 1965, on the advice of her family physician, Dr. Heath, she entered Onslow Memorial Hospital, Jack-

sonville, North Carolina, where she engaged the defendant, Dr. James Piver, as her surgeon to perform biopsies on her legs and right arm. The defendant performed the surgical procedures which "consisted of a linear incision . . . on the surface of each leg and . . . on the right arm. The surgeon removed certain subcutaneous tissues and one possible muscle" for the purpose of having a pathologist determine whether malignancy existed.

The plaintiff, on information and belief, alleged the defendant failed and neglected to use due diligence and skill in the post-surgical treatment and was also negligent in that:

"(a)  He negligently failed to follow proper procedures to keep the incisions made by him aseptic and caused or permitted the incision made in the plaintiff's right leg to become infected.

(b)  He negligently failed to use proper procedures in closing the incisions made by him for that he failed to bring the edges of the incision into close apposition and failed to properly align the edges of said incisions through the use of proper techniques of suturing.

(c)  He negligently failed and neglected to properly stitch or suture said incisions when he knew or in the exercise of due care should have known that the failure to properly stitch or suture said incisions would cause said incisions to heal in such a manner as to leave excessive, unnecessary and unsightly scarring."

The plaintiff further alleged that as a result of the defendant's negligent operation and treatment, the plaintiff has and will continue to have unsightly scars on her legs and arm which will continue to cause embarrassment for the rest of her life. She further alleged that the incisions became infected and she suffered pain and discomfiture during the healing process. The plaintiff testified:

"At that time (the day of discharge from the hospital) my legs were swollen pretty bad and paining pretty bad. There was drainage from both legs — it was yellow looking drainage.

After leaving the hospital, I went home. There was a lot of pain in my legs. There were two stitches in each leg and one stitch in my arm. Approximately two weeks after leaving the hospital the stitches were removed by Dr. Heath. . . . The first time I went to Dr. Heath to have the stitches removed after leaving the hospital, he did not remove them because he said the infection was still too bad in my legs to remove the stitches. . . .

*        *        *

After the stitches were removed, the incisions were red looking and they had wide gaps in them. Because they looked so bad, I wore patches over the incisions off and on for about a year. I didn't go out as much in public because I hated to wear the patches over my legs and they looked bad if I uncovered them. . . ."

The plaintiff called the defendant as an adverse witness. Dr. Piver admitted he employed two sutures in each incision. "The sutures were pulled tight". On cross examination by his own counsel, Dr. Piver was permitted to testify over plaintiff's objection that his procedures in performing the biopsies and in closing the incisions with two sutures was in accordance with approved surgical practices in Jacksonville.

The plaintiff called Dr. Julius Howell of Winston-Salem as an expert witness. Upon inquiry as to his qualifications, he testified he did his undergraduate work at Wake Forest College. In 1943 he received his medical degree at the University of Pennsylvania. Following graduation, he was admitted to practice his profession in North Carolina. He served one year of internship and one year of general surgery at the University of Pennsylvania. Then followed one year of pathology residency training and two years of nose and throat residency at the Baptist Hospital, Winston-Salem. Then followed one year of plastic surgery training at Cornell University Medical School and Hospital in New York City. He is a member of the American Board of Plastic and Reconstructive Plastic Surgery; the American, state and local medical societies; the American and the Southwest Plastic and Reconstructive Plastic Surgery Associations; the American College of Surgeons; the Research Council of Plastic Surgery; and the American Foundation of Plastic and Reconstructive Plastic Surgery. Since 1949, he has been on the teaching staff of Bowman Gray School of Medicine. The court found the witness to be an expert.

In June, 1965, Dr. Howell examined the plaintiff. She gave a history of the biopsy surgical procedures performed by Dr. Piver. She explained the infections following the surgery and the pain incident thereto. The witness examined the scars resulting from the biopsies. On the right leg the scar measured 1-¼″ in length and 1/5″ in width. A scar of similar length on the left leg measured ¼″ in width. The witness further testified that tightly drawn sutures compress an incision to such an extent as to block out fresh blood supply and prevent blood from reaching all parts of the incision. The lack of fresh blood supply tends to produce atrophy and to permit infec-

tion. He testified in his opinion two sutures were insufficient properly to close the two incisions in the legs.

Plaintiff's counsel proposed a long hypothetical question based on the premise the facts be found as recited in the question and called for an opinion of the witness (if he had one satisfactory to himself) as to whether procedures followed would conform to good surgical practice in Jacksonville, North Carolina or in similar communities. The witness stated he was not familiar with the actual practice in Jacksonville, but he was familiar with practice in similar communities around Winston-Salem. He offered to testify that in such similar areas the procedure described in the hypothetical question would not be according to approved practice. The witness, in addition to the recitals in the hypothetical question, had the benefit of an actual examination of the scars.

In sustaining the defendant's objection to the question and the proposed answer, the trial court acted upon the assumption that the law required the expert to be familiar with the locality where the alleged improper practices occurred; and that one who testifies as to his knowledge of similar localities would not qualify him to give an expert opinion.

The plaintiff testified Dr. Piver closed each incision on her legs by using two sutures. Dr. Piver, on his adverse examination, was asked this question: "(I)n order to hold the edges of the wound in that position, were these sutures pulled tight? A. Yes sir."

Dr. Howell was asked this question: "Doctor, do you have an opinion satisfactory to yourself as to whether or not sutures placed in the manner in which these sutures were placed would retard healing and if so, why? (Answer in the absence of the jury) A. It would retard healing for the reason that it would cause compression of the tissues which would tend to block out the blood supply coming into the edges of the skin and this would therefore cause the blood supply to be diminished, and if enough pressure is exerted, that would cause some death of some tissue right at the edge of the wound; it would cause some red color and if the wound got infected, it would be hard for the blood supply to get in to counter the infection." The foregoing question and answer were excluded upon defendant's objection.

At the conclusion of the plaintiff's evidence, the court, on defendant's motion, entered judgment of involuntary nonsuit. The plaintiff appealed, assigning errors.

*Aycock, LaRoque, Allen, Cheek and Hines by C. B. Aycock for the plaintiff.*

*E. W. Summersill and Marshall & Williams by Alan A. Marshall for the defendant.*

HIGGINS, J.

The plaintiff seeks to hold the defendant financially responsible for injury and damage she alleges resulted from his negligent surgical treatment. She does not allege a lack of professional learning, skill or ability to perform the operation. *Starnes v. Taylor,* 272 N.C. 386, 158 S.E. 2d 339; *Belk v. Schweizer,* 268 N.C. 50, 149 S.E. 2d 565; *Galloway v. Lawrence,* 266 N.C. 245, 145 S.E. 2d 861; *Hunt v. Bradshaw,* 242 N.C. 517, 88 S.E. 2d 762; *Nash v. Royster,* 189 N.C. 408, 127 S.E. 356. She does allege, however, the defendant was negligent: (1) By attempting to close incisions of such length (1-¼″ and 1-½″) by the use in each instance of only two sutures; (2) By drawing the sutures too tightly, thus impeding the flow of blood necessary to heal the incisions and to prevent infection; and (3) By inserting the sutures too far from the edges of the skin, resulting in excessive scarring. *Watson v. Clutts,* 262 N.C. 153, 136 S.E. 2d 617.

The operative procedures here involved would seem to be as simple and uncomplicated as any cutting operation one may imagine. Reason does not appear to the non-medically oriented mind why there should be any essential differences in the manner of closing an incision, whether performed in Jacksonville, Kinston, Goldsboro, Sanford, Lexington, Reidsville, Elkin, Mt. Airy, or any other similar community in North Carolina.

In this connection, it may be observed that while the defendant was on the stand (as an adverse witness), his own counsel, over objection, was permitted to ask the question and receive the answer here quoted: "State whether or not you followed these procedures, the ordinary and customary and accepted procedures, in such cases. A. Yes, sir. . . . The surgery that I did on Mrs. Wiggins was identical to the surgery that I do daily and prior to her operation I had done daily and since her operation have done daily. This procedure is in accordance with good medical practice. I followed the procedures required by good medical practice. . . ."

The witness' answer as to the ordinary, customary and accepted procedures was not limited to Jacksonville or even to similar areas. However, the defendant, by successful objection, excluded testimony of Dr. Howell because he was not familiar with Jacksonville.

Unless the trial court committed error in excluding the testimony of Dr. Howell, the judgment of nonsuit should be sustained. The picture changes, however, if Dr. Howell's testimony is added to the other evidence. *Koury v. Follo,* 272 N.C. 366, 158 S.E. 2d 548. Hence, the admissibility of Dr. Howell's testimony is crucial and determinative of this appeal.

[2]     The question of law presented simply stated is this: Was Dr. Howell's testimony on a simple operative procedure (closing shallow incisions after removing a small amount of tissue) rendered incompetent because he was not familiar with the practice in Jacksonville. He did have knowledge of these procedures in similar localities around Winston-Salem. The trial court excluded the testimony, adhering strictly to the "locality rule".

[1]     Our cases hold that a physician or surgeon must "possess the degree of professional learning, skill and ability which others similarly situated ordinarily possess". The rule stated refers to the minimum qualifications a physician or surgeon must have in order to qualify him to render personal services in his field. The cases further hold that even though the physician or surgeon possess the qualifications, he still must exercise reasonable care and diligence in the application of his knowledge and skill to the patient's case. *Starnes v. Taylor, supra,* and cases therein cited.

The "locality rule" (never recognized in England) had its origin in the very old and far away days when there were many little institutions which called themselves medical schools. Students were admitted who could show a high school diploma or furnish a certificate from a school principal that the bearer had completed the "equivalent" of a high school course of study. At the end of the course, he was given an M.D. degree. Passing the licensing board was in the nature of a formality. In many rural communities, ever thereafter the doctor was on his own. Frequent refresher courses, now generally attended, were unknown. The practice in the earlier days is described in the concurring opinion in *Sims v. Ins. Co.,* 257 N.C. 32, 125 S.E. 2d 326.

Now medical schools admit only college graduates. They are equipped to the highest point of efficiency and turn out doctors who must continue their studies by internships and by actual experience under expert supervision. They continue to study, continue to attend refresher courses, and have access to journals which afford them opportunity to keep them current in the latest treatments and procedures.

In the old days, there was some reason for the "locality rule" as the standard by which to judge a doctor's procedures. Then, except for a few stops on the railroads, the quickest mode of travel was by "coach and four". Forty miles between sun up and sun down was a full day's travel — less than 50 minutes will suffice today. A doctor's practice was limited to a small area. Because of the vast changes, some of which are touched on here, the reason for the "locality rule" has ceased to exist. Objections to the rule are being made from all sides. Here is a quotation from Prosser on Torts, 3d Ed., Negligence, Standard of Conduct, p. 166 (citing many cases):

"Allowance also has been made for the type of community in which the physician carries on his practice, and for the fact, for example, that a country doctor cannot be expected to have the equipment, facilities, libraries, contacts, opportunities for learning, or experience afforded by large cities. The older decisions sometimes stated this as a standard of the 'same locality;' but this is now quite generally recognized as too narrow. Later cases expanded it to speak of 'the same or similar localities,' thus including other towns of the same general type. The present tendency is to abandon any such formula, and treat the size and character of the community, in instructing the jury, as merely one factor to be taken into account in applying the general professional standard."

The following is from N. C. L. Rev., Vol. 46, April, 1968: "Most courts have realized that the 'same' locality is too narrow, and have extended the rule to include 'same or similar' localities." (Citing many cases) Northwestern L. Rev., Vol. 60, 1965-66, speaking of the "locality rule" says: ". . . Even at its inception, some courts rejected this strict application of the locality rule and held that the underlying policy would still be observed if a doctor from a *similar* community could testify as to the proper standard of care. The insurmountable handicap which confronted a plaintiff in a community with only one doctor was an important factor in early rejection of the strict rule. * * * Most courts which originally embraced the *same* locality principle have now abandoned it in favor of the *similar* locality view." (Citing many cases) Stanford L. Rev., Vol. 14, Dec. 1961-July 1962, says: ". . . In recent years changes in the rural-urban population pattern of the country and changes in medical education, training, and communication have led to greater standardization of medical practices. Thus, even in cases involving the general practice of medicine, many courts adhering to the 'same locality' rule have extended the geographical area within the defined

locality; other courts have adopted a 'similar locality' rule; and others have adopted a standard of reasonable care under the circumstances, with defendant's locality as one of the circumstances. . . ." (Citing many cases)

The purpose of the foregoing citations is two-fold: (1) To disclose the reason for the "same locality" rule; and (2) To demonstrate that under modern conditions the rule has lost all potency. Rules of evidence are creatures of experience and are never frozen. Experiences and conditions change and consequently require changes in the practical methods of dealing with them, even in the courts. Usually changes are gradual and amendments and exceptions to rules take care of them.

The idea of changes to meet changed conditions is not new in this Court. On April 4, 1905, Justice Connor, in *Ins. Co. v. Railroad,* 138 N.C. 42 (original 33 Reprint) discussed the subject:

". . . The question is of first impression in this State. We have given it careful and anxious consideration, desiring to make no departure from the well-settled principles of the law of evidence or the decisions of this Court, at the same time recognizing and keeping in view the duty of the Court to make diligent effort to find in those general principles such safe and reasonable adaptability that in the changing conditions of social, commercial, and industrial life there may be no wide divergence in the decisions from the standards by which men are guided and controlled in important practical affairs. The law of evidence, based upon certain more or less well-defined general rules, evolved from experience, has been molded by judicial decision and legislative enactment into a system having for its end and purpose, and believed to be adapted to, the discovery of truth in judicial proceedings. . . ."

[2] We now hold the trial court committed error in excluding the testimony of Dr. Howell and consequently in entering the judgment of nonsuit. The judgment is set aside. The case is remanded to the Superior Court of Onslow County for jury trial.

Reversed and remanded.