BOYD S. DICKENS, Administrator of the Estate of SHIRLEY MARIE DICKENS v. DR. C. D. EVERHART

No. 12

(Filed 10 October 1973)

1. Physicians, Surgeons, Etc. § 11— care required of physicians

It is not enough to absolve a physician from liability that he possesses the required professional knowledge and skill, but he must exercise reasonable diligence in the application of that knowledge and skill to the particular patient's case and give to the patient such attention as the case requires from time to time.

Dickens v. Everhart

2. **Physicians, Surgeons, Etc. § 11— care required of physicians — error of judgment**

    A qualified physician who forms his judgment after a careful and proper examination or investigation of a particular patient's condition is not an insurer of his diagnosis or of the success of his treatment and is not liable for an honest error of judgment.

3. **Physicians, Surgeons, Etc. § 11— care required of physicians — knowledge of drugs**

    The care and knowledge required of a physician extends to the physician's selection and use of drugs in the treatment of the patient and to his knowledge of the dangers inherent in their use.

4. **Physicians, Surgeons, Etc. § 11— care required of general practitioner**

    The general practitioner is not liable by reason of his failure to possess the degree of knowledge and skill ordinarily possessed by a specialist in the field of his specialty.

5. **Physicians, Surgeons, Etc. § 11— care required of physicians — character of community**

    The character of the community in which a physician practices is a circumstance to be considered in determining the degree of skill and ability to be required of him.

6. **Physicians, Surgeons, Etc. § 11— care required of physicians — practice in similar communities**

    A physician is held to the standard of professional competence and care customary in similar communities among physicians engaged in his field of practice.

7. **Evidence § 50; Physicians, Surgeons, Etc. § 15— malpractice action — medical testimony — practice in similar community**

    In this malpractice action, the trial court erred in ruling that, because plaintiff's medical expert was not in 1964 familiar with the quality of medical practice in Mount Airy, he could not state his opinion as to whether the defendant's treatment of decedent in Mount Airy in 1964 was in accord with accepted medical practice in 1964 in a community similar to Mount Airy.

8. **Evidence § 48— absence of formal tender of witness as expert — question of qualification — appellate review**

    The Court of Appeals erred in ruling that the qualification of plaintiff's medical witness to answer hypothetical questions propounded to him was not presented because plaintiff did not formally tender the witness as an expert where it is obvious that plaintiff was tendering the witness as a medical expert and the defendant and the court so understood, the witness testified in detail as to his qualifications as a medical expert in pathology, defendant's objections were not directed to the witness's general qualifications as an expert pathologist but were objections to specific questions on the ground the witness was not qualified to answer them, and the court expressly ruled, as a matter of law, on his qualification to answer those questions.

Dickens v. Everhart

ON *certiorari* to review the decision of the Court of Appeals, reported in 17 N.C. App. 362, 194 S.E. 2d 221, finding no error in the judgment of *Crissman, J.,* for the defendant.

The plaintiff brought this action to recover of the defendant, a practicing physician in Mount Airy, for injury to and the wrongful death of his seventeen year old daughter, Shirley Marie, alleged to be due to negligent failure of the defendant in treating her. The jury found that she was not injured by and did not die as the result of negligence by the defendant. Judgment was entered in accordance with the verdict.

The plaintiff introduced evidence to the following effect:

Shirley Marie had a tooth extracted on the afternoon of 3 October 1964. She was in good health prior thereto. A severe headache developed after her return to her home. The dentist advised her mother to consult a physician. The defendant, who was not the family physician and who had never previously treated Shirley Marie, was called by telephone. He instructed the mother to take Shirley Marie to the emergency room of the hospital, stating that he would meet them there. He did not. The nurse in charge of the emergency room administered by hypodermic 2 cc's of Mepergan, an analgesic, without taking the girl's temperature or her pulse.

Shirley Marie and her parents remained at the hospital waiting for the defendant. When he arrived, an hour later, she was asleep. The defendant said she was "asleep on that medicine," so there was no need in his examining her, that she should be taken home and would sleep until noon the next day and be all right. No further medication was administered at that time.

The following day the girl did not arouse and, after several attempts, her mother finally reached the defendant by telephone in the late afternoon. At his direction, they returned to the hospital where the defendant met them, Shirley Marie being still asleep. He admitted her to the hospital and prescribed glucose, which was given, saying this would cause her to wake up in about four hours. About midnight, without regaining consciousness, Shirley Marie began to move about in apparent pain. She was then given a shot of Codeine (ordered by the defendant) and very quickly thereafter ceased to breathe. The nurse administered artificial respiration. The defendant having been called, returned to the hospital and made arrangements

for the girl's immediate transfer to the Baptist Hospital in Winston-Salem, to which she was taken by ambulance. On arrival, she had no respiration and exceedingly low temperature and blood pressure, was limp and unconscious. Artificial respiration was continued and she was given an antibiotic to counteract a suspected infection. Without regaining consciousness, she died six days later. An autopsy revealed that she was suffering from blood poisoning, the accepted treatment for which is the administration of antibiotics.

Following the above evidence, the plaintiff called as his witness Dr. Phillip M. Toyama. He testified that he graduated from the College of Medicine of Howard University in 1963, served his internship at Youngstown, Ohio, from 1963 to 1964, trained in Pathology at Los Angeles County Medical Center in California from 1964 to 1968, practiced Pathology in California until September 1969, then moved to Winston-Salem, North Carolina, to head the Department of Pathology at Reynolds Memorial Hospital, where he remained until April 1972, at the time of his testimony he was practicing Pathology in two hospitals in Galax, Virginia, and is licensed to practice in North Carolina, Virginia and California. He further testified that at the hospitals in Winston-Salem and Galax, he had had patients from the Mount Airy area and was familiar with the general practice of medicine in the community, including Mount Airy. In California he practiced in Riverside, a community slightly larger than Mount Airy, about 70 miles east of Los Angeles.

The record does not show that the plaintiff formally tendered Dr. Toyama as an expert. The defendant objected to certain hypothetical questions, proper in form, as to whether the defendant's treatment of Shirley Marie was in accordance with accepted medical practice in the community of Mount Airy as of 3 October 1964. The objections were sustained, the court stating, in the absence of the jury:

> "My chief reason for sustaining the objection is that this man was either a medical student or an intern in Ohio or somewhere else in 1964. In my view it is impossible for him to know what is the customary practice in this case at that time."

The defendant introduced evidence to the following effect:

He had no recollection of having received a call from the mother of Shirley Marie prior to her visit to the emergency

room at the hospital. When the girl and her parents arrived there, the nurse in charge telephoned him and told him the girl's history, blood pressure and temperature, whereupon he prescribed the injection of Mepergan to relieve the pain until he could see the patient. He did go to the emergency room and see her there. At that time he did not consider the possibility of blood poisoning from the extraction of the tooth, although that is one risk of tooth extraction. He had never seen Shirley Marie prior to this occasion. The shot of Codeine, given for pain the night of October 4, was given by the nurse at his direction in response to the nurse's telephone call and, in response to her further telephone call to the effect that the patient had stopped breathing, he rushed back to the hospital and made arrangements to transfer Shirley Marie to the Baptist Hospital. When he saw the patient some two hours earlier at the local hospital, he considered the possibility of some infection in the body but felt there was none and so did not give her medication therefor. At the time of prescribing the Codeine, he had decided there was no infection present. In his opinion the Codeine had nothing to do with the girl's ceasing to breathe, but, when he returned to the hospital on that account, he gave her another drug to counteract the effect of the Codeine.

Other physicians practicing in Mount Airy, called as witnesses for the defendant, testified that his treatment of Shirley Marie was in accord with general practice of medicine in Mount Airy at that time.

The Court of Appeals held it was unnecessary for it to pass upon the validity of reason given by the trial court for sustaining the objection to the hypothetical questions propounded to Dr. Toyama, for the reason that the defendant did not admit that Dr. Toyama was a medical expert and the plaintiff did not ask the court to find him to be one. It also considered numerous assignments of error by the plaintiff and found no merit therein.

*White & Crumpler by James G. White and Michael J. Lewis for plaintiff.*

*Folger & Folger by Fred Folger, Jr., for defendant.*

LAKE, Justice.

The basis of liability of a physician or surgeon for negligence in the care of his patient is thus stated in *Hunt v. Bradshaw,* 242 N.C. 517, 88 S.E. 2d 762:

> "A physician or surgeon who undertakes to render professional services must meet these requirements: (1) He must possess the degree of professional learning, skill and ability which others similarly situated ordinarily possess; (2) he must exercise reasonable care and diligence in the application of his knowledge and skill to the patient's case; and (3) he must use his best judgment in the treatment and care of his patient. [Citations omitted.] If the physician or surgeon lives up to the foregoing requirements he is not civilly liable for the consequences. If he fails in any one particular, and such failure is the proximate cause of injury and damage, he is liable."

To the same effect see: *Starnes v. Taylor,* 272 N.C. 386, 158 S.E. 2d 339; *Koury v. Follo,* 272 N.C. 366, 158 S.E. 2d 548; *Galloway v. Lawrence,* 266 N.C. 245, 145 S.E. 2d 861; *Hawkins v. McCain,* 239 N.C. 160, 79 S.E. 2d 493; Strong, N. C. Index 2d, Physicians, Surgeons, etc., § 11.

**[1-3]** Thus, it is not enough to absolve the physician from liability that he possesses the required professional knowledge and skill. He must exercise reasonable diligence in the application of that knowledge and skill to the particular patient's case and give to the patient such attention as the case requires from time to time. *Galloway v. Lawrence, supra.* On the other hand, a qualified physician, who forms his judgment after a careful and proper examination or investigation of the particular patient's condition, is not an insurer of his diagnosis or of the success of his treatment and is not liable for an honest error of judgment. *Belk v. Schweizer,* 268 N.C. 50, 149 S.E. 2d 565; *Kennedy v. Parrott,* 243 N.C. 355, 90 S.E. 2d 754. The requirement as to care and knowledge extends to the physician's selection and use of drugs in the treatment of the patient and to his knowledge of the dangers inherent in their use. *Koury v. Follo, supra.*

**[4-6]** In *Wiggins v. Piver,* 276 N.C. 134, 171 S.E. 2d 393, this Court rejected the "locality rule" to the effect that, in order to recover on the ground of failure to possess or use the requisite professional skill and ability, the injured patient must prove

that the defendant failed to possess or use the skill and ability customary in the community in which the service was rendered. We there reaffirmed the rule that the physician or surgeon must possess the degree of learning, skill and ability which others *similarly situated* ordinarily possess. Thus, the general practitioner is not liable by reason of his failure to possess the degree of knowledge and skill ordinarily possessed by a specialist in the field of his specialty. Similarly, the character of the community in which the defendant practices is a circumstance to be considered in determining the degree of skill and ability to be required of him. Prosser on Torts, 3rd ed., Negligence, p. 166. He is, however, held to the standard of professional competence and care customary in similar communities among physicians engaged in his field of practice. Thus, in *Wiggins v. Piver,* we held that an expert witness, otherwise qualified, may state his opinion as to whether the treatment and care given by the defendant to the particular patient came up to the standard prevailing in similar communities, with which the witness is familiar, even though the witness be not actually acquainted with actual medical practices in the particular community in which the service was rendered at the time it was performed.

[7] It follows that the learned trial judge erred in his conclusion and ruling that, because Dr. Toyama was not in 1964 familiar with the quality of medical practice in Mount Airy, Dr. Toyama could not state his opinion as to whether the defendant's treatment of Shirley Marie Dickens was in accord with accepted medical practice in 1964 in a community similar to Mount Airy.

The answers given by the witness, in the absence of the jury, to the hypothetical questions propounded were somewhat equivocal. We are unable to say, however, that had the jury heard them the verdict would not have been affected thereby. Consequently, the error of the trial court cannot be deemed harmless.

[8] The Court of Appeals took the view that, since the plaintiff did not formally tender Dr. Toyama as an expert witness, the ruling of the trial court could not be deemed reversible error and so the question of his qualification to answer the hypothetical questions propounded was not reached. In this we think the Court of Appeals erred.

The record discloses that Dr. Toyama first testified in detail as to his medical education, internship and practice in the field of Pathology. Without objection, he testified as to the meaning of certain medical terms used by another medical witness as descriptive of the condition of this girl, saying that these were synonymous with blood poisoning, and testified as to accepted treatment therefor. The first of the hypothetical questions to which objections were interposed then followed. No ground for the objection was stated. In response to a question by the court, the witness then testified that he came to North Carolina after the treatment of this patient by the defendant. It was expressly on that ground that the court sustained the objections to the several hypothetical questions. After the first objection was sustained and the answer of the witness thereto was put into the record in the absence of the jury, he continued to testify, without objection, concerning the effects of Codeine and Mepergan, upon the respiratory and nervous systems.

When the witness was asked to compare the community in California in which he had practiced with the community of Mount Airy, the court sustained an objection by the defendant. The jury was then excused. In its absence, a voir dire was conducted in which the two communities were compared and the experience of the witness, as a practicing pathologist, was set forth. The jury then returned and in its presence hypothetical questions, proper in form, were propounded as to whether the administration of the shots of Mepergan and Codeine to this patient was in accordance with accepted medical practice "in the community including the community of Mount Airy." The court sustained the objection of the defendant to these questions, stating that his reason for doing so was that, since Dr. Toyama was elsewhere in 1964, it was "impossible for him to know what is the customary practice in this case at that time."

Obviously, the plaintiff was tendering Dr. Toyama as a medical expert witness and the defendant and the court so understood. It is equally obvious that the defendant's objections were not directed to Dr. Toyama's general qualifications as an expert pathologist but were objections to the specific questions on the ground that Dr. Toyama was not qualified to answer them. The court expressly ruled, as a matter of law, on his qualification to answer those questions.

Nothing else appearing, when a question calling for the opinion of a witness, not previously offered as an expert, is propounded and an objection is made, if there is no finding by the court, or admission by the adverse party, that the witness is qualified to testify as an expert, the sustaining of the objection will not be held error by the appellate court. *Lumber Co. v. Railroad,* 151 N.C. 212, 65 S.E. 920; Stansbury, North Carolina Evidence, 2d Ed., § 133; Strong, N. C. Index 2d, Evidence, § 48. It is always the better practice for the party offering an expert witness to tender him as such formally and to request the court to find him to be such. See, *State v. Perry,* 275 N.C. 565, 169 S.E. 2d 839. However, to apply the above stated general rule under the facts of this case is to look solely to form and to disregard substance. The intent to offer the witness as an expert being clear, his qualifications being shown and the adverse ruling of the court thereon being expressly stated, together with the reason therefor, the record presents for appellate review the validity of the court's ruling.

The judgment of the Court of Appeals is, therefore, reversed and the matter is remanded to that court for the entry of an order granting a new trial.

Reversed and remanded.