BURT E. RUCKER v. HIGH POINT MEMORIAL HOSPITAL, INC., AND HORACE HENRY STOVALL, M.D.

No. 81

(Filed 1 July 1974)

1. Evidence § 50; Physicians, Surgeons, Etc. § 15— treatment of gunshot wounds — qualification of expert — familiarity with practices at accredited hospitals

In an action against a hospital and a staff doctor in the hospital's emergency room to recover damages allegedly resulting from defendants' negligence in failing properly to treat a shotgun wound sustained by plaintiff in his lower leg, the trial court erred in exclud-

ing testimony by plaintiff's medical expert on the ground that the witness was not acquainted with the medical staff at defendant hospital and did not know about its facilities where defendant hospital was a fully accredited hospital, and the expert witness testified that he was familiar with duly accredited hospitals and that the standards and practices of such hospitals in the treatment of gunshot wounds of the extremities are essentially the same throughout the United States.

2. **Hospitals § 3; Master and Servant § 3; Physicians, Surgeons, Etc. § 11— emergency room physician — employee of hospital**

Contract of employment between a hospital and a staff physician in the hospital's emergency room established the relationship of employer and employee.

3. **Physicians, Surgeons, Etc. § 17— negligence in treating gunshot wound**

In an action against a hospital and a staff doctor in the hospital emergency room to recover damages allegedly resulting from negligence in failing properly to treat a shotgun wound in plaintiff's lower leg, issues of fact for the jury were raised by the pleadings, the evidence admitted tending to show that defendant doctor merely looked at the wound, instructed the nurse to give a shot and told plaintiff to see his own doctor, and the erroneously excluded testimony by plaintiff's medical expert that standard practice required x-rays and certain other studies in the treatment of shotgun wounds of the lower extremities.

ON *certiorari* to the North Carolina Court of Appeals to review its decision filed February 20, 1974 (20 N.C. App. 650, 202 S.E. 2d 610) ordering a new trial in this action which *Judge Lupton* dismissed at the close of the plaintiff's evidence. On November 13, 1970, the plaintiff, Burt E. Rucker, instituted this civil action in the Superior Court of GUILFORD County against the defendants, High Point Memorial Hospital, Inc., and Dr. Horace Henry Stovall, seeking to recover damages resulting from the defendants' alleged negligence in failing properly to treat the plaintiff's gunshot wounds sustained on November 22, 1969, as the result of a hunting accident.

The plaintiff's complaint alleged:

"1. Plaintiff is a resident of the City of High Point, Guilford County, North Carolina.

"2. Plaintiff is informed and believes that defendant High Point Memorial Hospital, Inc., is a North Carolina corporation organized and existing under and by virtue of law, and authorized to and was at all times herein mentioned engaged in operating and managing a fully accredited hospital in the City of High Point, North Carolina, acting

through and by its agents and servants, all within the course and scope of their employment.

"3. Plaintiff is informed and believes that defendant Horace Henry Stovall is a citizen and resident of Guilford County, North Carolina.

"4. Plaintiff is informed and believes that at all times herein mentioned, defendant Horace Henry Stovall, M.D., was a physician and surgeon duly licensed to practice medicine in the State of North Carolina, and was employed by defendant High Point Memorial Hospital, Inc., in its Emergency Room in High Point, North Carolina, where he held himself out to possess that degree of skill, ability and learning common to medical practitioners in said community and similar communities.

"5. On November 22, 1969, plaintiff Burt E. Rucker came under the consultation, advice, care, diagnosis and treatment of the defendants. Such was rendered as a result of an extensive shotgun injury which the plaintiff received on the lower part of his left leg earlier in the same day.

"6. The defendants were so negligent in the advice, care, consultation, diagnosis and treatment that was given, and were generally so negligent in the premises that as a proximate result of all such negligence, plaintiff suffered a severe, painful and disabling injury to his left leg as is hereinafter described in more detail.

"7. The resulting injuries and damages to the plaintiff were a proximate cause of the negligence and carelessness of the defendants.

"8. By reason of the aforesaid negligence and carelessness on the part of the defendants, plaintiff's left leg was allowed to develop into a gangrenous state. Extensive hospitalization and operative procedures have been required, and plaintiff is informed and believes they will be required in the future. Plaintiff has suffered pain, injury, mental anguish and disfigurement, as well as other difficulties and loss of enjoyment of life; and he is informed and believes that this will continue for the remainder of his natural life. He was required to expend sums of money for hospitalization, medical treatment and care, and incur other expenses with regard to this injury; and he is informed and believes

that this will continue into the future. Plaintiff missed time from and eventually lost his gainful employment in consequence of these injuries; and he is informed and believes that he is permanently disabled from working, and that he has been otherwise damaged in the sum of Two Hundred Fifty Thousand Dollars ($250,000.00)."

The defendant, Dr. Stovall, filed answer on December 30, 1970, admitting allegations 1, 2, 3, 4, and 5 of the complaint. Other allegations were denied. As further defenses, he alleged: (1) The complaint failed to state a cause of action upon which relief can be granted; (2) he gave the plaintiff emergency treatment and referred him to his regular physician for further treatment; (3) the plaintiff failed to go to his regular doctor as directed and in so doing failed to exercise due care for his own safety and his negligence caused or contributed to his injury and damages.

The defendant, High Point Memorial Hospital, Inc., filed answer admitting allegations 1, 2, and 3 in the complaint. Replying to allegation 4, the defendant denied that it employed Dr. Horace Henry Stovall or that he was an agent of the Hospital; and that in treating the plaintiff he was acting on his own behalf and not for the Hospital; his dealing with the plaintiff was in the nature of an independent contractor.

The defendant Hospital alleged these further defenses: (1) The plaintiff has not stated a claim upon which relief can be granted. (2) The plaintiff was guilty of contributory negligence in failing to seek continued medical treatment which failure caused and aggravated his injury and damages; and his own contributory negligence barred his right to recover.

A pre-trial conference was held at which the plaintiff listed the names of the expert witnesses he expected to call. The list included Dr. Julius L. Levy, but did not include Dr. Thomas Wood.

At the trial, the plaintiff offered evidence in material substance as here disclosed: On March 22, 1969, he and a companion, Gregory Palmer, were hunting rabbits in the woods near Mount Gilead in Montgomery County. At about ten o'clock in the morning Mr. Palmer fired his .12 gauge shotgun at a rabbit running through bushes. A part of the load of number four shot struck the plaintiff in the left leg between the knee and the

ankle. At the time, the hunters were about fifty feet apart. The shot pattern covered an area about the size of a man's hand. Approximately fifty pellets penetrated the plaintiff's leg.

Immediately following the accident, Mr. Palmer took the plaintiff to Dr. Armstrong, a general practitioner in Mount Gilead. Dr. Armstrong administered first aid and advised immediate hospitalization. The plaintiff was carried to the emergency room of the High Point Memorial Hospital in High Point, arriving at about 1:30 p.m. approximately three hours after the accident. The defendant, Dr. Stovall, was on duty as the staff physician in charge of the emergency facilities of the Hospital.

Dr. Stovall examined the wound, instructed the nurse "Just give him a shot," told the plaintiff to go home and apply heat treatment, and that his local doctor would be able to take care of his injury. Dr. Stovall did not give or advise x-ray examination of the wound and did not make any effort to have him admitted for further examination, treatment, or surgery and did not call a surgeon or other specialist to examine and treat the injury.

When the plaintiff arrived at home his doctor was not immediately available. During the next two days his pain became excruciating. His daughter returned him to the High Point Memorial Hospital. Another physician at the Hospital had the plaintiff admitted as a patient. X-ray examination disclosed the presence of "gas gangrene" in the injured leg. The plaintiff, under the direction of Dr. Parham, was removed to Duke Hospital at Durham.

The plaintiff remained in Duke Hospital for weeks undergoing numerous surgical operations to remove dead and infected tissue. In addition to his suffering, the plaintiff has lost seventy-five percent of the functional use of his leg. The loss is permanent.

The plaintiff called as his expert witness, Dr. Julius L. Levy who testified that he graduated from Tulane University in 1954 with a B.S. degree and in 1957 with an M.D. degree. He served his one year internship and four year's residency in surgery at Charity Hospital in New Orleans. The hospital had a capacity of 3,000 beds. During his residency in surgery he treated patients in practically every scope of medical and surgical involve-

ment. He was certified by the American Board of Surgery in 1963. Thereafter he practiced in Virginia and in various towns and cities in Mississippi and in Louisiana. He practiced in Clarksdale, Mississippi, a city of 32,000. He served two years in the Naval Hospital in Portsmouth, Virginia. He was one of five surgeons who supervised the surgical service and supervised twelve surgical residents and a varying number of interns in a fully accredited hospital of 1600 beds at Portsmouth, Virginia. "Accreditation for a hospital, to my knowledge, consists of passing an examination or inspection every other year by the Joint Commission on the Accreditation of Hospitals which, I believe, is a subsection of the American Medical Association. . . . To the best of my knowledge, every hospital I have practiced in has been a fully accredited hospital."

In June 1965, Dr. Levy joined the faculty of the Tulane University Medical School on a part-time basis and since 1965 has continued his private practice and his association with the University. "I am an Associate Professor of Surgery. I am a Fellow of the American College of Surgeons, the International College of Surgeons, and . . . . I belong to the Orleans Parish Medical Society, the Louisiana State Medical Society, The Southern Medical Association, the New Orleans Surgical Society, the Surgical Association of Louisiana, Southeastern Surgical Congress, among possibly others. . . . I am visiting surgeon at Charity Hospital; and I am consultant at Alexandria, Louisiana, Veterans' Memorial Hospital, at Huey P. Long Hospital, Charity Hospital in Alexandria, Louisiana, Lallie Kemp Charity Hospital in Independence, Louisiana; and I am a Consultant at the Keesler Air Force Base Hospital in Biloxi, Mississippi." Dr. Levy has practiced in cities the size of High Point and in cities larger and smaller.

Dr. Levy testified that he had kept up with the surgical practices and procedures in hospitals, other than those on whose staffs he served, by attending seminars, professional society meetings, by reading reports and medical journals, and by conferring with other doctors. "To the best of my knowledge, the treatment of gunshot wounds of the extremities is standard throughout the United States, among qualified surgeons."

He further testified: "I do not know of any variations of standards of the management of gunshot wounds of the lower extremities from any one community to another, not within the

United States. . . . In the case of a delayed inspection . . . the presence or absence of infection . . . testing of the portion of the leg past the injury, to determine whether any major nerves . . . had been damaged by the missiles. An x-ray would be necessary to determine whether or not there had been any bony involvement . . . it would be helpful in a shotgun wound to find out whether or not any of the pellets lay in proximity to the arteries . . . or the nerves. . . . [X]-ray would also be indicated to see the number of pellets present, because this would reflect the extent of the injury. These studies and examinations are absolutely standard for a shotgun injury to the lower extremity, between the knee and the ankle; I would say these were the minimum standards acceptable under the circumstances of a gunshot wound to the area below the knee." X-ray examination is standard. The evidence disclosed that Dr. Stovall superficially examined the injury, ordered an injection of an antibiotic and pain medication, and sent the plaintiff to his country doctor for further treatment.

Dr. Levy testified that in the various hospitals where he had practiced he had personally treated perhaps a thousand gunshot wounds of which as many as two hundred were shotgun wounds.

" . . . There is no difference in the standards of treatment of gunshot wounds to the lower extremities in the hospitals where I have practiced in Clarksdale, Mississippi, in Norfolk, Virginia Naval Hospital, in Alexandria, Louisiana, in Biloxi, Mississippi, in Touro Infirmary in New Orleans, in Sara Mayo Hospital in New Orleans, East Jefferson Hospital in Metairie, Louisiana, or Lakeside Hospital in Metairie, Louisiana. From my attendance in seminars, reading of publications, my academic affiliations, my travels and speaking with other doctors, keeping up with the literature, to the best of my knowledge, the standards are the same around the United States; there is no difference in the standards."

Dr. Levy would have testified before the jury as above indicated. Judge Lupton, however, excluded the testimony for the reason that Dr. Levy stated he was not acquainted with the medical staff at High Point Memorial Hospital and did not know about its facilities. The exclusion of this testimony was the subject of plaintiff's Exception No. 3, Assignment of Error No. 2.

After the court had refused to permit Dr. Levy to testify, the plaintiff called Dr. Thomas Wood as its expert witness who would have testified, if permitted, as to the standards of care and treatment in High Point, or in similar communities, and that the treatment provided by Dr. Stovall and by the High Point Memorial Hospital did not measure up to required standards. However, the court refused to permit the examination and testimony of Dr. Wood on the ground that he had not been listed by the plaintiff as his expert witness.

At the conclusion of the plaintiff's evidence, the court allowed motions to dismiss made by Dr. Stovall and by High Point Memorial Hospital. On appeal, the North Carolina Court of Appeals ordered a new trial, holding, however, that the trial court had not committed error in refusing to permit the plaintiff to offer Dr. Levy's testimony before the jury. Our certiorari to the Court of Appeals brought the decision here for review.

*Arch Schoch, Jr. and Ellis I. Kahn for plaintiff appellee.*

*Sapp and Sapp by Armistead W. Sapp, Jr. for defendant appellant High Point Memorial Hospital, Inc.*

*Perry C. Henson and Sammy R. Kirby for defendant appellant Horace Henry Stovall, M.D.*

*W. C. Harris, Jr. and Randolph L. Worth for North Carolina Hospital Association, Amicus Curiae.*

HIGGINS, Justice.

[1]   We agree with the conclusion of the North Carolina Court of Appeals that a new trial should be awarded in this case. However, we are of the opinion that the trial court committed error in excluding from the jury the testimony of Dr. Levy. Dr. Levy admitted that he was not familiar with the facilities of the defendant hospital and was not familiar with the members of its staff or with their qualifications. He testified he was familiar with the standards of practice and procedures in duly accredited hospitals and that they were essentially the same throughout the United States. However, the plaintiff alleged and both defendants admitted that the defendant High Point Memorial Hospital was engaged, at all times herein mentioned, in operating and maintaining *"a fully accredited hospital"* in the City of High Point. (Emphasis added.)

Dr. Levy testified that he is familiar with fully accredited hospitals and the standards and practices of such hospitals are essentially the same throughout the United States in the treatment of gunshot wounds; that the treatment of such wounds is standard; that x-ray examination is required to determine the extent of the injury and to determine what, if any, operative procedures should be followed.

The testimony that the treatment is essentially the same is by no means surprising. All shotguns are smooth bore. They perform uniformly as to range and penetration. The ammunition provided for shotguns is practically uniform throughout the United States. To his knowledge acquired through service, seminars, personal consultations, journals and periodicals, gunshot wounds and their treatment are not essentially different in any section of the United States. Insofar as applicable to a local doctor, the rules are stated in *Dickens v. Everhart,* 284 N.C. 95, 199 S.E. 2d 440; *Wiggins v. Piver,* 276 N.C. 134, 171 S.E. 2d 393; *Brune v. Belinkoff,* 354 Mass. 102, 235 N.E. 2d 793; *Naccarato v. Grob,* 384 Mich. 248, 180 N.W. 2d 788; *Murphy v. Little,* 112 Ga. App. 517, 145 S.E. 2d 760; *Geraty v. Kaufman,* 115 Conn. 563, 162 A. 33; *McElroy v. Frost,* 268 P. 2d 273 (Okla. 1954); *Riley v. Layton,* 329 F. 2d 53 (10th Cir.).

In this case, however, we are not dealing with a local country doctor. We are dealing with a *duly accredited hospital* and a member of its staff who was in charge of its emergency department. To begin with, a country doctor (Dr. Armstrong) gave first aid and sent the plaintiff to the defendant Hospital where he knew facilities were available for proper treatment of gunshot wounds.

Clearly the plaintiff's injury required facilities more advanced than were available in a country doctor's office. Dr. Armstrong knew this and sent the plaintiff to the hospital where proper facilities were available. Sound reason supports the view that gunshot wounds of the lower leg lend themselves most readily to uniform medical and surgical treatment without regard to locality. Not all injuries are so uniform and the treatment so generally well known and followed. The medical profession in Alaska, for example, would be informed and knowledgeable on the treatment of snow blindness, frozen feet, and frostbitten lungs, but they would be without experience in the treatment of rattlesnake bites. A Florida doctor would know

about the snake bites, but not about frozen feet. A gunshot wound would require the same treatment whether in Florida or Alaska.

Dr. Armstrong made the first examination, performed the functions of giving first aid and of sending the plaintiff to the hospital. There Dr. Stovall took over instead of calling a specialist who by x-ray could examine and determine the extent of the plaintiff's injury and determine what should be done in the treatment. Instead, Dr. Stovall looked at the wound, instructed the nurse to give a shot, and sent the plaintiff back to a country doctor. Dr. Stovall's duty as a staff doctor in the emergency department, as disclosed by the contract with the defendant Hospital, required him to "diagnose and treat all conditions except those requiring the services of a specialist. When the illness or injury is such that the services of a specialist is required, the Physician will provide emergency care . . . pending the arrival of the specialist on back-up call, who shall be called promptly."

Judge Lupton refused to permit Dr. Levy to testify as an expert witness. The Court of Appeals agreed with that ruling. Hence, in order that the ruling may not become the law of the case, we hold that Judge Lupton committed error in refusing to permit Dr. Levy to testify as an expert witness for the plaintiff.

[2] The Court of Appeals correctly held that the contract of employment between the High Point Memorial Hospital and Dr. Horace Henry Stovall established the relationship of employer and employee. The answer of the hospital alleged that Dr. Stovall was an independent contractor. Here quoted are pertinent parts of the contract of employment which was identified and offered in evidence as plaintiff's Exhibit No. 11.

> "It is the intention of the Hospital to engage a staff of four full time Physicians to provide professional coverage for the Hospital Emergency Department. To this end it is the desire of the above parties to enter into an agreement whereby the above named Physician will provide professional services, as hereinafter set forth, for the Emergency Department of the Hospital. The Hospital hereby engages the services of the above named Physician who by the execution of this agreement accepts an appointment as a member of the four man Emergency Department Staff.

> "It is mutually understood that each Physician member of the group, when on duty, will see all patients who present

themselves to the Emergency Department for professional care. The Physician on duty will diagnose and treat all conditions except those requiring the services of a specialist. When the illness or injury is such that the services of a specialist is required the Physician will provide emergency care as indicated by the condition of the patient pending the arrival of the specialist on back-up call, who shall be called promptly. All services of the Emergency Department Physicians are to be performed in a manner as to further the best interest of the hospital including the best possible care and treatment of the patient with special emphasis on the maintenance of good public relations.

"Physicians appointed to this service are required to be licensed to practice medicine in the state of North Carolina and prior to appointment they must become a member of the Medical Staff of the Hospital in the same manner as all other medical staff members."

[3] Our writ of certiorari brought the record here for the review. The office of the writ "extends to the review of all questions of jurisdiction, power, and authority of the inferior tribunal to do the action complained of . . . . " *Belk's Department Store, Inc. v. Guilford County,* 222 N.C. 441, 23 S.E. 2d 897; *Chambers v. Board of Adjustment,* 250 N.C. 194, 108 S.E. 2d 211; *Russ v. Board of Education,* 232 N.C. 128, 59 S.E. 2d 589. For that reason we have discussed matters not stressed by the Court of Appeals. We hold the pleadings, the evidence admitted, and that which was erroneously excluded, raise issues of fact to be resolved by the jury.

The decision of the Court of Appeals awarding a new trial is

Affirmed.