J. CRAWFORD WILLIAMS v. JAMES L. REYNOLDS, D.V.M.

No. 7910SC674

(Filed 18 March 1980)

**Physicians, Surgeons and Allied Professions § 11.1— veterinarian—method of treating horse—expert's opinion testimony—familiarity with standard of care**

    In an action to recover damages for the death of plaintiff's horse as a result of the allegedly negligent method of treatment following castration surgery performed by defendant, the trial court erred in excluding testimony by plaintiff's witness, a veterinarian qualified as an expert with a "horse specialty," that the procedures employed by defendant were contrary to acceptable medical practice standards in Wake County, since the medical procedure involved was not complicated or rare but an operation routinely performed on riding and show horses; the witness's method of performing the operation would be the same whether he performed it in his prior place of practice or in Wake County; and the fact that the witness did not actually begin practicing in Wake County until two months after the treatment in question should not have required exclusion of his testimony but was merely a factor for the jury to consider in deciding what weight it would give his testimony.

APPEAL by plaintiff from *Godwin, Judge.* Judgment entered 29 March 1979 in Superior Court, WAKE County. Heard in the Court of Appeals on 5 February 1980.

Plaintiff brought this action to recover damages for the death of his registered American Quarter Horse, Cee Blair Lee. He alleged that the horse died on 2 November 1975 as the result of the negligent method of treatment employed by the defendant, a duly licensed veterinarian, following castration surgery performed by defendant on the horse on 27 October 1975. Defendant admitted performing the surgery and thereafter treating the horse, but generally denied any negligence in so doing.

At trial plaintiff offered evidence to the following effect:

Plaintiff and his wife raise and breed quarter horses for profit. On 27 October 1975 Mrs. Williams watched the defendant castrate their young quarter horse, Cee Blair Lee, at their farm on Route 6 in Wake County. Following the operation defendant gave the colt a tetanus shot and got him on his feet. He instructed Mrs. Williams to exercise the horse to prevent swelling and prescribed medication in the form of a "packet of red powder" and large tablets, both to be given in the colt's food. For the next three days, Mrs. Williams observed the colt carefully and exercised him regularly. On the morning of the fourth day, 31 October 1975, she noticed that the horse "had not touched his grain from the night before, which is . . . a danger signal." When she checked on him, she found him to be "considerably more swollen in the area of the operation" than he had been. She called the defendant who told her that the colt only needed exercise, so she exercised him more that morning before she put him in a lot to move around on his own.

By noon the swelling had not subsided at all. Plaintiff called the defendant again, and he came out to their farm about 5:00 that afternoon, administered a pink fluid, which he said was a diuretic, by needle into the horse's neck, and exercised the horse himself using a bull whip and a lunge line. He also gave Mrs. Williams three more large tablets which he identified as a diuretic to be crushed and put into the colt's food. He told her to continue the exercise.

The next morning, 1 November 1975, the colt appeared to be "even more swollen" and still had not eaten anything. According to Mrs. Williams,

In the horse's genital area the horse was swollen at least the size of a football. There was additional swelling, tremendous swelling, extending up from between his back legs, swollen all the way up between his front legs, the entire stomach area, and swelling up both sides of his body.

Plaintiff called the defendant, who told him that there were two ways to "attack" the problem: medication, using antibotics, or exercise. Defendant said he preferred exercise. He arrived at the farm around noon, exercised the colt again with the whip, and

periodically squeezed the swollen prepuce "to make it more pliable and flexible." The doctor was eventually able to push the prepuce back into the horse's abdomen and thereafter applied a pursestring suture to keep the prepuce contained. He prescribed that the horse be exercised fifteen minutes of every hour. Plaintiff followed the defendant's instructions for the remainder of that day and night. By 8:00 the next morning, the horse was dead.

Mr. Williams took the horse to the Rollins Animal Disease Diagnostic Laboratory in Raleigh where Dr. M. A. Ross, a veterinary pathologist, performed an autopsy. Dr. Ross diagnosed the cause of death to be due to "toxemia and/or a septicemia poisoning subsequent to the surgery." He defined "toxemia" as a poisoning resulting from a toxic breakdown of tissue or a toxic breakdown from dead bacteria. Septicemia, he said, can include a toxemia, but generally implies blood poisoning.

When Mr. Williams returned from the clinic, the defendant, without having been called, came out to the farm. Williams testified that defendant told him he had come by because "the night before he had read everything that he could find pertaining to the use of a pursestring suture and . . . he [had] found no instances where a prepuce had ever been contained with a pursestring suture in a horse, and that he thought it best to . . . remove it."

Plaintiff also offered the testimony of Dr. Mark B. Ashby, a veterinarian with a "horse specialty" who is licensed to practice in North Carolina and has practiced in Wake County since January 1976. He testified that he was graduated from the Veterinary Medical School at Purdue University in 1974; that he practiced for one year in Evansville, Indiana, and then practiced in Chicago for a while before coming to North Carolina; and that, in addition to North Carolina, he was licensed to practice in Indiana and Kentucky. Dr. Ashby was issued a temporary license to practice in this State upon arriving and received his permanent license after passing the required state examination in June 1976.

Dr. Ashby testified that he is "familiar with the accepted standards of practice of veterinarians in Wake County . . . and the surrounding area." However, the court refused to allow him to testify as to whether he was familiar with the accepted standards "as those practices were carried on during October and

November, 1975". Neither was he allowed to answer hypothetical questions, which sought to elicit his opinion as to whether the treatment prescribed by the defendant "could or might have been unacceptable medical procedure for practicing veterinarians in the Wake County area."

At the close of the plaintiff's evidence, the court allowed the defendant's motion for a directed verdict. Plaintiff appealed.

*Reynolds & Howard, by Ted R. Reynolds and E. Cader Howard, for the plaintiff appellant.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, by Samuel G. Thompson, for the defendant appellee.*

HEDRICK, Judge.

Medical practitioners in North Carolina "must possess the degree of learning, skill and ability which others *similarly situated* ordinarily possess." *Dickens v. Everhart,* 284 N.C. 95, 101, 199 S.E. 2d 440, 443 (1973) [emphasis in original]. *See also Wiggins v. Piver,* 276 N.C. 134, 171 S.E. 2d 393 (1970). What "similarly situated" means is not defined with precision. It envisions a standard of professional competence and care customary in the field of practice among practitioners in similar communities which, in turn, suggests a consideration of such factors as the nature of the treatment involved; the degree of specialization, if any, required; the character of the community concerned; and the comparability of medical facilities available. What the standard permits is an otherwise qualified expert witness to state an opinion as to whether the treatment prescribed by the defendant in the particular case accords with the standard prevailing in similar communities with which the witness is familiar, "even though the witness be not actually acquainted with actual medical practices in the particular community in which the service was rendered at the time it was performed." *Dickens v. Everhart, supra* at 101, 199 S.E. 2d at 443. Thus, in *Dickens,* a physician who was practicing in Riverside, California at the time of the alleged malpractice by a physician in Mount Airy, North Carolina, was held competent to testify as to the standard of care required and the accepted medical practice prevailing in a community similar to Mount Airy. In *Wiggins v. Piver, supra,* plaintiff called as her witness a doctor from Winston-Salem to testify as to accepted

medical practice in Jacksonville, North Carolina. The witness stated that he was not familiar with the actual practice in Jacksonville, but that he was familiar with the approved practice in similar communities around Winston-Salem. In holding that his testimony was competent, our Supreme Court, through Justice Higgins, quoted approvingly from Prosser on Torts: "The present tendency is to . . . treat the size and character of the community, in instructing the jury, as merely one factor to be taken into account in applying the general professional standard." *Wiggins v. Piver, supra* at 140, 171 S.E. 2d at 397.

While the trial judge in the case now before us appears to have been thoroughly familiar with the rule of law as laid down in *Wiggins,* he nevertheless refused to permit Dr. Ashby to testify that he was familiar, in October and November of 1975, with the accepted medical practices respecting the treatment of a horse that has just been castrated in communities similar to Wake County. The judge sustained defendant's objections to every question designed to elicit Dr. Ashby's familiarity with and knowledge of the prevailing standards. Thereafter, he granted the defendant's motion for a directed verdict, apparently accepting defendant's argument "that the plaintiffs [sic] have presented insufficient evidence of actionable negligence on the part of the defendant for the case to be considered by the jury, . . ."

The situation changes, however, when the excluded testimony of Dr. Ashby is considered. From the record it appears that, had he been permitted, Dr. Ashby would have testified that he is familiar with the accepted standards of practice for veterinarians "in communities similarly situated with the community of Wake County, North Carolina, as those practices were carried on during October and November, 1975"; that the procedures of veterinary medicine he followed before coming to North Carolina and those he had followed since coming do not differ in any way; that he did nothing different in performing a castration operation on a horse in Illinois or Indiana than he would do in North Carolina [*see Rucker v. High Point Memorial Hospital, Inc.,* 285 N.C. 519, 206 S.E. 2d 196 (1974)]; and that he knows of his "own knowledge" what the accepted practices of veterinary medicine were within Wake County and the surrounding area at the time of the alleged negligent treatment administered to plaintiff's horse by defendant. He would have

testified further that, in his opinion, the procedures employed by defendant to treat the horse following the castration operation "would have been contrary to acceptable medical standards in Wake County" for the reason that, if exercise had not reduced the swelling within 24 hours, according to Dr. Ashby, "therapeutic levels of antibiotics . . . and also therapeutic levels of corticosteroids" should have been administered. Dr. Ashby's testimony would render plaintiff's evidence sufficient to raise an issue of actionable negligence for the jury to resolve and, thus, the granting of a directed verdict for defendant would be error.

We think the judge did err in excluding the testimony. We are not dealing in this case with a complicated, novel or rare medical procedure, but rather with an operation commonly and routinely performed on certain male animals, especially riding and show horses. The Court's observations in *Wiggins, supra* at 138, 171 S.E. 2d at 395-96 are, we think, equally applicable in this case: "The operative procedures here involved would seem to be as simple and uncomplicated as any cutting operation one may imagine. Reason does not appear to the non-medically oriented mind why there should be any essential differences in the manner of" castrating a horse.

Furthermore, to say that this veterinarian, who is otherwise qualified as an expert with a "horse specialty," cannot testify as to the accepted medical standards prevailing in Wake County during October and November 1975, simply because he did not begin practicing here until two months later, is fatuous. The fact that he was not actually practicing in Wake County at the actual time of treatment is merely a factor for the jury to consider in deciding what weight it will give to his testimony. *Wiggins v. Piver, supra.*

We hold that the trial court erred in excluding the testimony of Dr. Ashby and consequently in granting the defendant's motion for a directed verdict. The judgment entered thereon is reversed, and the matter is remanded to the Superior Court.

Reversed and remanded.

Judges VAUGHN and CLARK concur.