LINDA L. HOWARD, GUARDIAN AD LITEM FOR EULA B. CAULEY v. JAMES D. PIVER AND ONSLOW HOSPITAL AUTHORITY

No. 804SC979

(Filed 7 July 1981)

1. **Physicians, Surgeons and Allied Professions § 15.2— departing from standard of care—similar locality rule—competency of medical witness**

   In a medical malpractice action based on the alleged negligence of defendant physician in discontinuing anti-seizure medication which an epileptic patient had taken for 30 years to control her seizures, the trial court erred in excluding testimony by plaintiff's medical expert that defendant's discontinuance of the anti-seizure medication did not conform with the standard of care for physicians and surgeons in Jacksonville, N.C. and other similar communities on the ground that the witness was not competent to testify about the standard of care in Jacksonville or other similar communities where the witness testified that he was an instructor on the staff at N.C. Memorial Hospital and a faculty member at the U.N.C. School of Medicine, that he had patients referred to him from all hospitals within North Carolina, and that he

Howard v. Piver

was familiar with the standard of care for physicians and surgeons in Jacksonville, N.C. and other similar communities.

**2. Hospitals § 3.2 — action against hospital — insufficient evidence of negligence**

In an action to recover for personal injuries received by an epileptic patient when she suffered seizures after her physician had discontinued her use of anti-seizure medicine, plaintiff's evidence was insufficient for the jury on the issue of defendant hospital's negligence since the hospital did not breach its duty of care when its nurses did not verbally report all of the patient's complaints to her physician, and even if there had been such a breach of duty, there was no evidence that such breach proximately resulted in harm to the plaintiff.

APPEAL by plaintiff from *Strickland, Judge.* Judgments entered 17 and 18 October 1979 in Superior Court, ONSLOW County. Heard in the Court of Appeals 10 April 1981.

This is a medical malpractice action brought by the plaintiff Linda L. Howard, the daughter and guardian ad litem for Eula B. Cauley, against the defendants to recover damages for personal injuries. The injuries were the result of the defendants' alleged negligence in removing Mrs. Cauley, an epileptic patient, from certain anti-seizure medication and in failing to administer anti-seizure medication and therapy while Mrs. Cauley was hospitalized. Answers denying negligence were filed on behalf of the defendants, Dr. James D. Piver and the Onslow Hospital Authority (Hospital). The trial court directed a verdict for the Hospital at the close of plaintiff's evidence and, at the close of all the evidence, granted Dr. Piver's motion for a directed verdict.

In July 1976, Mrs. Cauley was a chronically ill 71-year-old woman with a long history of medical problems. She was first diagnosed as being an epileptic in the early 1940's, and has taken Dilantin and Phenobarbitol, which are anti-seizure medications, since a hospitalization at that time. Occasionally, even though she was taking her anti-seizure medication, Mrs. Cauley would have light seizures called petite mal seizures, and would black out.[1]

On 12 July 1976 Mrs. Cauley went to the office of Dr. James D. Piver and complained of vomiting and a pain in her rib area.[2]

---

1. Linda Howard testified that from 1973 to 1976 her mother, Mrs. Cauley, would have light seizures "[p]robably once a month or so."

2. Mrs. Cauley had fractured her ribs on 4 July 1976 as a result of a fall during a petite-mal seizure. She was admitted to the hospital by Dr. Batcheller, the

Howard v. Piver

During Dr. Piver's examination of Mrs. Cauley, Linda Howard told Dr. Piver that Mrs. Cauley needed to have her drugs "reevaluated." At that time, Mrs. Cauley was taking Dilantin, Phenobarbitol, Librium, Composine, Empirin, Codeine, aspirin and Vibramycin. Following his examination of Mrs. Cauley, Dr. Piver listed as his "impression" the following: (1) peptic ulcer; (2) mild paralytic ileus; and (3) over ingestion of drugs. Dr. Piver indicated to Linda Howard that he would put Mrs. Cauley back into the hospital, run tests on her to determine what was wrong, and further indicated that he would take Mrs. Cauley off all her medication. Linda Howard testified that she told Dr. Piver of Mrs. Cauley's history of epilepsy and of her need to be kept on the anti-seizure medication. Mrs. Cauley was admitted to the hospital on 12 July 1976. According to Dr. Piver, he removed her from all her medication, including her anti-seizure medication, to reestablish drug levels.

On 13 July 1976, at approximately 5:00 a.m., a nurse at the Hospital telephoned Dr. Piver to tell him that Mrs. Cauley was restless and that she was complaining of pain and coughing. Dr. Piver ordered an injection of 130-mg of phenobarbitol. At 5:25 a.m. on 13 July 1976, when Mrs. Cauley complained "I feel like I'm going to have one of those unconscious spells," the nurse gave her the injection of phenobarbitol which Dr. Piver had previously ordered.

On the morning of 14 July 1976 Mrs. Cauley experienced a series of six grande mal seizures. Three or four of those grande mal seizures were classified as severe. As a result of the seizures, Mrs. Cauley broke both of her shoulders because, in the opinion of one physician, the muscle ligaments in her shoulders contracted so tightly that they broke the humerus. Mrs. Cauley was transferred to the intensive care unit on the afternoon of 14 July 1976 where she was administered Dilantin and Phenobarbitol. She remained in the intensive care unit until 17 July 1976 when she

medical partner of Dr. Piver. Dr. Batcheller continued her Dilantin and Phenobarbitol during this admission and, in addition, placed her on inhalation therapy, antibiotics and codeine. During this hospitalization, the nurses' notes reflect nausea and vomiting by Mrs. Cauley. Dr. Batcheller discharged Mrs. Cauley on 8 July 1976 and made an appointment for her to see him in his office on 12 July 1976. The plaintiff, Linda Howard, took Mrs. Cauley to Dr. Batcheller's office and she was seen by Dr. Piver.

was evacuated by helicopter to Duke Hospital. After her discharge from Duke Hospital, Mrs. Cauley was sent to a nursing home[3]; prior to her admission on 12 July 1976 Mrs. Cauley lived with her husband in their home in Jacksonville.

*Grover C. McCain, Jr., and Archbell & Cotter, by James B. Archbell, for plaintiff appellant.*

*Marshall, Williams, Gorham & Brawley, by Daniel Lee Brawley, for defendant appellee Piver.*

*Harris, Cheshire, Leager & Southern, by W. C. Harris, Jr., for defendant appellee Onslow Hospital Authority.*

BECTON, Judge.

[1]  The trial court's refusal to allow opinion testimony by plaintiff's expert witness, Dr. Paul T. Frantz, is the principal and pivotal issue in this case.[4] Its resolution is dispositive of the directed verdict granted in favor of Dr. Piver.

Plaintiff sought, through the opinion testimony of Dr. Frantz, to establish that Dr. Piver was negligent. Dr. Frantz testified[5] first that he was familiar with the standard of care for physicians and surgeons in Jacksonville, North Carolina and other similar communities and, second, that Dr. Piver's discontinuation of the Dilantin and Phenobarbitol did not conform with the said standard of care. The trial court excluded this testimony[6] and concluded as a matter of law that Dr. Frantz was not a competent witness to testify about the standards of care in Jacksonville or

---

3. Dr. Paul Frantz testified that the series of grande mal seizures suffered by Mrs. Cauley contributed in a cause and effect relationship to pulmonary pneumonia, respiratory insufficiency, and congestive heart failure subsequently suffered by Mrs. Cauley.

4. At oral argument plaintiff abandoned her argument that the court, by excluding questions relating to a tonsillectomy, foiled her attempt to impeach Dr. Piver.

For reasons set forth in part IV, *infra*, we conclude that plaintiff has failed to make out a prima facie case against the Hospital.

5. The testimony of Dr. Frantz was taken by deposition prior to trial and was offered and objected to at the time of trial.

6. On cross examination, Dr. Frantz testified that he had never been in Onslow Memorial Hospital or in Jacksonville; that he did not know any doctors in Jacksonville and that he had never practiced medicine in any hospital in North Carolina other than North Carolina Memorial Hospital in Chapel Hill.

other similar communities. We disagree with the trial court's conclusion.

Dr. Frantz' competency as an expert medical witness in this case and his familiarity with the standards of practice for general medicine and surgery in communities such as Jacksonville were sufficiently established to submit this case to the jury. Dr. Frantz was licensed to practice medicine in North Carolina in 1971. By 1978 Dr. Frantz was not only an instructor on the staff at North Carolina Memorial Hospital, but was also a faculty member at the University of North Carolina School of Medicine.[7] He testified:

> I have patients who are referred to me from all hospitals within North Carolina for cardiac surgery or for removal of lung cancers, and so forth . . .

> [Moreover], hospital records are sent to us for review and so, although I have not practiced in other hospitals within the State of North Carolina, I am familiar with different hospitals' record keeping systems in having reviewed them as patients are referred to me.

The horse-and-buggy days are gone.[8] The old "locality rule"—which rigidly required the medical expert to be familiar with the locality where the alleged improper practice occurred—has been rejected by our courts. *Wiggins v. Piver*[9], *276 N.C. 134, 171 S.E. 2d 393 (1970)*; *Dickens v. Everhart*, 284 N.C. 95, 199 S.E. 2d 440 (1973); *Page v. Hospital*, 49 N.C. App. 533, 272 S.E. 2d 8 (1980). Now, it is well established that a physician's standard of

---

7. He received his undergraduate degree at the University of the South in Sewanee, Tennessee; he received his medical degree at Georgetown University in 1971. Following graduation, he completed the requirements for the National Board of Medical Examiners entitling him to be licensed in the State of North Carolina. He served one year of internship and four years of surgical residency at the University of North Carolina. He was certified by the American Board of Surgery in 1978 and was certified by the American Board of Thoracic Surgery in 1979. He specializes in cardio-thoracic surgery.

8. We note that North Carolina Memorial Hospital in Chapel Hill is approximately 150 miles from Jacksonville; that advice from physicians and specialists at teaching centers is only a telephone call away; that medical conferences, seminars, and conventions take place on a state-wide basis regularly; and that control of epileptic patients with anti-seizure medication has been known at least since 1940 when Mrs. Cauley was first treated with anti-seizure medication.

9. Dr. Piver was also the defendant in *Wiggins v. Piver*.

care must be in accordance with the standards of practice among other physicians with similar training and experience in the same or similar communities at the time the cause of action arises. *See Wiggins v. Piver; Dickens v. Everhart.* Indeed, the *Wiggins'* "same or similar community" rule was restated in *Dickens*[10], and was subsequently codified in G.S. 90-21.12.[11]

The reasoning of the court in *Wiggins* is applicable here. "Reason does not appear to the non-medically oriented mind why there should be any essential differences in the manner of closing an incision, whether performed in Jacksonville, Kinston, Goldsboro, Sanford, Lexington, Reidsville, Elkin, Mt. Airy, or any other similar community in North Carolina." 276 N.C. at 138, 171 S.E. 2d at 395-96. The treatment of epilepsy with anti-seizure medication is a long-established practice. Plaintiff's underlying thesis in this case is that Dr. Piver should not have discontinued her medication which she had taken for thirty years to control her seizures, and that the discontinuation of her seizure medication would predictably precipitate seizures. Reason does not appear in this case, considering the nature of the medical question involved, why a different standard should apply to the discontinuation of anti-seizure medication in Jacksonville, in Kinston, in Goldsboro, or even in Chapel Hill.

*Wiggins* is also instructive because of its suggestion that, even under the old "locality rule," courts considered the nature of the medical question involved in ruling on the competency of a medical witness to testify. *See also Page v. Hospital.* If the medical procedure was simple and routine, there was less adherence to the "locality rule." If the medical procedure was

10. "[A]n expert witness, otherwise qualified, may state his opinion as to whether the treatment and care given by the defendant to the particular patient came up to the standard prevailing in similar communities, with which the witness is familiar, even though the witness be not actually acquainted with actual medical practices in the particular community in which the service was rendered at the time it was performed." 284 N.C. at 101, 199 S.E. 2d at 443.

11. G.S. 90-21.12 provides: "In any action for damages for personal injury or death arising out of the furnishing or the failure to furnish professional services in the performance of medical, dental or other health care, the defendant shall not be liable for the payment of damages unless the trier of the facts is satisfied by the greater weight of the evidence that the care of such health care provider was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the alleged act giving rise to the cause of action."

sophisticated and specialized, there was more adherence to the "locality rule."

The case we consider now does not involve eye surgery, a heart transplant, or a similarly complicated medical procedure. We are considering a medical practice — the discontinuation of anti-seizure medication, *not the treatment of an epileptic patient undergoing seizures* — which doctors all over the state deal with on a regular basis. A decision to treat patients like Mrs. Cauley is frequently made by doctors practicing general medicine and surgery, and not necessarily by neurologists or other specialists. This is evidenced by the fact that Dr. Piver, as a doctor practicing general medicine and surgery, decided to treat Mrs. Cauley himself. When there are no variations in the standards for the handling of a particular medical problem from one community to another, a medical expert familiar with the standard and with the defendant's deviation from the standard is allowed to testify even though he has not been in the particular community. *Rucker v. Hospital*, 285 N.C. 519, 206 S.E. 2d 196 (1974); *Page v. Hospital*.

*Thompson v. Lockert*, 34 N.C. App. 1, 237 S.E. 2d 259, *disc. rev. denied*, 293 N.C. 593, 239 S.E. 2d 264 (1977) on which Dr. Piver relies, is distinguishable. In *Thompson* the plaintiff sought to show, through a New York doctor, that a Salisbury, North Carolina orthopaedic surgeon negligently performed a laminectomy-distectomy even though the New York doctor, apparently, was never asked if he were familiar with the standards of care in Salisbury or in similar communities. In this case, Dr. Frantz testified that he was familiar with the standard of practice in areas similar to Jacksonville. His testimony was not, as a matter of law, incompetent, and the jury should have been allowed to consider his opinions.

## II

Although we reverse for the reasons set forth above, we summarily address other evidentiary disputes that are likely to occur at the retrial. Dr. Frantz testified (1) that Dr. Piver's discontinuation of Mrs. Cauley's Dilantin and Phenobarbitol on 12 July 1976 was not in keeping with the standards of medical care for physicians and surgeons in Jacksonville or other similar communities; (2) that abrupt removal of an epileptic patient from seizure medication creates a serious risk of causing the patient to

Howard v. Piver

go into status epilepticus which is a known cause of death and which carries "grave consequences in a lady [Mrs. Cauley's] age;" (3) "that the abrupt withdrawal of her Dilantin and Phenobarbitol precipitated, a number of hours later after the blood levels of Dilantin had dropped below the threshhold range, her . . . recurrent repeated seizures . . ."; and (4) that Mrs. Cauley appeared to be "under controlled or. . . , the blood levels, of her [anti-seizure] medication were too low and that an adjustment by raising them was more appropriate certainly than by removing them altogether."

The trial court's decision to exclude the testimony set out above appears to be grounded on the court's erroneous adherence to the "locality" as opposed to the "similar community" rule. It was improper for the court, on that basis, to exclude Dr. Frantz' testimony.

### III

Similarly, the court's decision to grant Dr. Piver's motion for a directed verdict was controlled by its earlier decision that Dr. Frantz could not testify that he was familiar with the standard of care in Jacksonville or other similar communities. If Dr. Frantz' testimony had been admitted, plaintiff could have withstood a motion for directed verdict.

### IV

[2] The Hospital did not breach its duty of care when its nurses did not verbally report all of Mrs. Cauley's complaints to Dr. Piver. Even if there had been such a breach of duty, there is no evidence that that breach proximately resulted in harm to the plaintiff. Since there was no evidence from which the trier of fact could conclude that the hospital was liable, the trial court properly granted the Hospital's motion for directed verdict at the close of plaintiff's evidence.

Accordingly, as to defendant Onslow Hospital Authority, we affirm. As to defendant James D. Piver, we reverse and remand for a new trial not inconsistent with this opinion.

Judge MARTIN (Robert M.) and Judge WHICHARD concur.