SHERRY CHAPMAN POWELL v. DR. L. NEWELL SHULL, JR.; DRS. ROACH, HANCOCK AND SHULL, P.A.

No. 8125SC875

(Filed 6 July 1982)

1. **Physicians, Surgeons, and Allied Professions § 17.3— malpractice—treatment of arm fracture—denial of directed verdict for defendants proper**

    In a malpractice action concerning the treatment of an arm fracture, the trial court properly denied defendants' motion for a directed verdict on the negligence issue where the evidence tended to show that the normal healing period for a fracture of the type sustained by plaintiff is approximately 10-12 weeks; that 12 weeks after plaintiff's injury the doctor was fully aware that plaintiff's injury had not healed properly; that by two and one-half months after the accident he was greatly concerned about the increase in angulation and apposition at the fracture site; that plaintiff testified the doctor told her three and one-half months after her accident that her arm had healed, and that she could return to work, chop wood and do construction work; and that another doctor testified that if her doctor had made these statements to plaintiff, her doctor's treatment was not in accordance with the accepted standard of care in the community.

2. **Physicians, Surgeons, and Allied Professions § 20.2— instructions—submission of contributory negligence error**

    In a malpractice action in which plaintiff specifically alleged that her doctor negligently treated her between 17 April 1977 and 2 August 1977 for a fracture of her arm, the trial court erred in submitting a contributory

negligence issue to the jury which was based on plaintiff's failure to return to see her doctor as ordered after 1 August 1977 and on plaintiff's failure to consult an orthopedic specialist until 14 October 1977 since plaintiff kept all scheduled appointments with her doctor between 18 April 1977 and 1 August 1977 and since her failure to return to defendants' office after 2 August 1977 and her failure to contact an orthopedic specialist prior to 14 October 1977 did not proximately cause or contribute to the injuries she received prior to 1 August 1977.

APPEAL by plaintiff from *Cornelius, Judge.* Judgment entered 2 March 1981 in Superior Court, BURKE County. Heard in the Court of Appeals on 6 April 1982.

Plaintiff, Sherry Chapman Powell, filed suit on 27 March 1979 to recover damages resulting from the alleged negligence of Dr. L. Newell Shull[1] who treated plaintiff for injuries she sustained in an automobile accident. From a judgment for Dr. Shull in this medical negligence case, plaintiff appeals. Dr. Shull cross-assigned error pursuant to Rule 10(d) of the North Carolina Rules of Appellate Procedure.

*Powell & Settlemyer, P.A., by Douglas F. Powell, for plaintiff appellant.*

*Mitchell, Teele, Blackwell & Mitchell, by W. Harold Mitchell and Marcus W. H. Mitchell, Jr., for defendant appellees.*

BECTON, Judge.

## I

Plaintiff fractured her arm in an automobile accident on 16 April 1977, and Dr. Shull treated her for the injury received. Alleging, among other things, (i) that Dr. Shull negligently performed closed reduction surgery of the fracture which resulted in a fibrous nonunion of the fracture; (ii) that Dr. Shull negligently failed to perform open reduction surgery; (iii) that plaintiff ultimately had to consult an orthopedic surgeon, Dr. Larry Anderson, who performed "an open reduction and fixation of fibrous malunion with plate fixation and bone graft and excision of distal

---

1. When reference is made to the defendants, we will use "defendant" or "Dr. Shull," since plaintiff's action against Drs. Roach, Hancock and Shull, P.A. is based solely upon plaintiff's claim that the negligence of Dr. Shull is imputed to the defendant Professional Association.

ulna . . . ;" and (iv) that plaintiff experienced pain and suffering, a permanent partial disability, and a permanent deformity in that her injured arm is now shorter than her other arm; plaintiff filed suit and prayed for damages in excess of $10,000.

Defendant, in his Answer, admitted that Dr. Shull had treated plaintiff for a broken arm, denied negligence, and alleged that plaintiff was contributorily negligent by not returning to Dr. Shull's office as separately ordered by Dr. Shull and Dr. Hancock, and by failing, for a two and one-half month period, to seek medical treatment.

Although many facts were disputed at trial, the following facts were undisputed. After Dr. Shull advised plaintiff that she had a fracture of the distal third of the radius, he performed a closed reduction of the fracture on 17 April 1977. The x-rays taken following the closed reduction reveal a 50% to 60% apposition fracture fragment. Plaintiff was discharged on 18 April 1977 and told to return in one week. Between 18 April 1977 and 1 August 1977 plaintiff kept all of her appointments with, and was seen by, Dr. Shull on 25 April 1977, 16 May 1977, 2 June 1977, and 1 July 1977. Between 18 April 1977 and 1 July 1977, the degree of apposition present at the fracture site decreased from the 50% to 60% range to 10%. Although defendant Shull concluded on 1 July 1977 that plaintiff "only had 10% apposition" remaining, that the radius had not aligned properly, and that "there was an increase of angulation at the fracture site," Dr. Shull did not inform plaintiff about these matters. Plaintiff was last seen by Dr. Shull on 1 August 1977. Plaintiff contacted Dr. Larry Anderson, a specialist in orthopedic surgery, on 14 October 1977. As a result of this consultation, plaintiff was hospitalized on 8 November 1977, and Dr. Anderson performed an open reduction of the fracture.

Considering these undisputed facts and other facts that were hotly contested and disputed, the jury answered the issues submitted as follows:

1. Was the plaintiff injured or damaged by the negligence of the defendant?

Answer: Yes.

2. If so, did the plaintiff by her own negligence contribute to her injuries?

Answer: Yes.

3. What amount, if any, is the plaintiff entitled to recover of the defendant?

Answer: $20,500

Following the verdict, the trial court declared a mistrial, but later vacated that order and entered judgment on the verdict, treating the jury's award of damages as surplusage. Plaintiff then filed notice of appeal.

## II

Although some of the trial court's evidentiary rulings and portions of the trial court's instructions to the jury were excepted to, the dispositive issues on this appeal relate to the trial court's decision at the end of all the evidence to deny defendants' motion for a directed verdict and to deny plaintiff's motion for a directed verdict on the issue of contributory negligence.

First, we discuss defendant's cross-assignment of error — "that the plaintiff's evidence was insufficient to establish actionable negligence."

A. Defendant's Motion for Directed Verdict

[1] In this medical negligence action, the burden is upon the plaintiff to prove by the greater weight of the evidence not only that Dr. Shull was negligent but also that such negligence proximately caused her injuries. Generally, in order to recover for personal injury arising out of the furnishing of health care, the plaintiff must demonstrate by the testimony of a qualified expert that the care provided by defendant was not in accordance with the accepted standard of care in the community. *Ballenger v. Crowell,* 38 N.C. App. 50, 54, 247 S.E. 2d 287, 291 (1978). "It has never been the rule in this State, however, that expert testimony is needed in *all* medical malpractice cases to establish either the standard of care or proximate cause. Indeed, when the jury, based on its common knowledge and experience, is able to understand and judge the action of a physician or surgeon, expert testimony is not needed." *Smithers v. Collins,* 52 N.C. App. 255, 260, 278 S.E. 2d 286, 289, *disc. rev. denied,* 303 N.C. 546, 281 S.E. 2d 394 (1981). *See also Jackson v. Sanitarium,* 234 N.C. 222, 226-27, 67 S.E. 2d 57, 61-62 (1951), *rehearing denied,* 235 N.C. 758, 69 S.E. 2d

29 (1952). Moreover, once the standard of care is established, whether by expert or non-expert testimony, a doctor's departure from that standard of care may be shown by non-expert witnesses. *Id.*, 67 S.E. 2d at 62.

Since, on defendant's motion for a directed verdict, we take the evidence in the light most favorable to the plaintiff, we elect not to set out the evidence elicited by defendant in cross examining plaintiff's witnesses and the evidence brought out by defendant in his own case in chief. Plaintiff called two orthopedic surgeons to testify at trial. One, Dr. Larry Anderson, testified in response to a hypothetical question that Dr. Shull had ample opportunity to observe the healing process to the plaintiff's arm. The second doctor, Dr. Charles Lockert, testified similarly, but also was asked, and answered, the following hypothetical question:

> Q. Doctor, if the jury should believe the following to be the facts, and by the greater weight, that Dr. L. Newell Shull, Jr. examined the plaintiff on 17 April 1977 and performed a closed reduction of the displaced fracture to the radius involving the junction of the middle and distal third; that he obtained 50% to 60% apposition of the radius; that he released the plaintiff on 18 April 1977 from the hospital after having applied a long arm cast; that x-rays and examinations taken on 17 April 1977 after casting showed no change in position and alignment; that x-rays taken on 25 April 1977 showed no change in position and alignment; that examination and x-rays taken on, again, 16 May 1977 showed 20% to 30% apposition and that plaintiff was continued in a short arm cast; that examination and x-rays taken on 2 June 1977 after the cast was removed showed slight displacement with 25% to 30% apposition; that plaintiff was examined on 6 June 1977 complaining of pain and the short arm cast was reapplied; that x-rays and examination done 1 July 1977 showed 10% apposition and overall loss of alignment; that plaintiff continued in the cast; that x-rays taken on 1 August 1977 along with examination showed 10% apposition and overall loss of alignment; that only slight callus formation was ever present during any of the examinations; that the treating physician never advised the plaintiff of any difficulty, never referred her to a specialist; that the treating physi-

cian on each examination advised the plaintiff that her arm was healing nicely [;] that she could return to work or chop wood; that on 1 July 1977 there was a displacement of 85% to 100% of the radius at the fracture site. Based on that set of hypotheticals do you have an opinion satisfactory to yourself as to whether the standard of care received by the plaintiff, Sherry Powell could have been in accord with proper medical practice in general use within the community of Caldwell County or similar communities among practitioners engaged in the defendant's field of practice, Dr. Shull's field of practice?

OBJECTION: Overruled.

A. I do.

MOTION TO STRIKE: Denied.

Q. What is that opinion?

OBJECTION: Overruled.

. . . .

A. Based purely on all the facts that you've given me in the hypothetical question as to whether it could have been in accordance, if you take into consideration everything in the hypothetical question, I would say it could not have been in accordance.

MOTION TO STRIKE: Denied.

After specifically stating that his answer to the hypothetical question was based solely on the facts in the hypothetical question, Dr. Lockert also testified, that if defendant told plaintiff that she had no problems, that she was well and healed and capable of any type of work, including chopping wood, then defendant's conduct would constitute a deviation from the standard of care required of physicians engaged in the practice of operative orthopedics in Caldwell County, or in similar communities.

In addition to the testimony of Dr. Anderson and Dr. Lockert, Dr. Shull, himself, testified that plaintiff's fracture did not heal properly within the normal healing period and that he was greatly concerned about the progressive increase in angulation at the fracture site.

Contending that Dr. Shull should have told her about the condition of her arm and should have referred her to a specialist[2] instead of telling her on 1 August 1977 that her arm was healed, that she could return to work, chop wood or do construction work, plaintiff argues that Dr. Shull's testimony, itself, establishes a standard of care which he violated. Dr. Shull testified that he had a duty to inform plaintiff of any risk of proceeding with a closed, as opposed to open, reduction of the fracture, but that he never informed plaintiff of the risk of the treatment; Dr. Shull also testified that he had a duty to advise his patients of the possibility of an adverse result, but failed to so inform plaintiff.

In her brief, plaintiff has excerpted certain portions of Dr. Shull's testimony which we include herein:

There were some important changes from May 16, to June 2. As I recall, there was an increase in the angulation at that time, I think the apposition was pretty well the same. I did not tell the patient that these changes had progressed. I didn't tell her anything about any changes. . . . With regard to how much deformity she had on June 2, she had some angulation at that point and approximately about 20% apposition at that time. I did not tell her that only 20% of the bones in the radius of her arm were touching and meeting each other.

. . . .

. . . I concluded on July 1, that she only had 10% apposition remaining. . . . No sir, I didn't tell her that she had a deformity whereby 90% of the bones weren't even in alignment or touching each other . . . I did conclude on July 1, after reviewing the films that the alignment of the radius was of grave concern to me. No sir, I didn't tell her that. I didn't want to upset her.

. . . .

. . . The alignment was of great concern on the 1st of July. On August 1, there had been no change, it was still of

---

2. Dr. Shull testified that, *after* August 2, he and Dr. Hancock "decided that the [plaintiff] should probably be referred to an orthopedist," but that they "made no active efforts . . . to communicate that to her."

concern. It was approximately of the same concern as it was on July 1. I did not tell the patient on August 1 that she had a serious deformity of the arm. She had a deformity of the arm.

.    .    .    .

I did not tell the patient she would have loss of strength in the wrist. I felt that she would, yes sir.

.    .    .    .

. . . I knew that I had the duty to refer her to a specialist more qualified than me if and when I felt that I could no longer adequately treat her for her injuries.

We have detailed the testimony of Dr. Lockert and Dr. Shull because the question of negligence is close, especially considering the testimony of Dr. Anderson and the following testimony of Dr. Lockert:

Yes, a closed reduction of a fracture of the distal third of the radius is an acceptable reduction procedure. Open reductions are also an acceptable procedure. Both procedures sometimes result in complications which in turn result in either a non-union or a malunion of the bones. These occur with or without any fault or negligence on the part of the treating physician.

Dr. Shull's testimony coupled with Dr. Lockert's response (albeit a limited response) to the hypothetical question posed, when weighed on the scales used on motions for directed verdict tip the balance in plaintiff's favor. It is to be remembered that a jury can believe all, part, or none of what an expert says. Dr. Shull testified that the normal healing period for a fracture of the type sustained by plaintiff is approximately ten to twelve weeks; that twelve weeks after plaintiff's injury he was fully aware that plaintiff's injury had not healed properly; and that by 1 July 1977 he was greatly concerned about the increase in angulation and apposition at the fracture site. Plaintiff testified that Dr. Shull told her on 1 August 1977 that her arm had healed, and that she could return to work, chop wood and do construction work. Dr. Lockert testified that if Dr. Shull made these statements to plaintiff, Dr. Shull's treatment was not in accordance with the accepted stand-

ard of care in the community. Taking this evidence in the light most favorable to the plaintiff, and considering the fact that Dr. Shull made no effort to refer plaintiff to a specialist, we are compelled to uphold the trial court's decision to deny defendants' motion for a directed verdict on the negligence issue. On the evidence presented, a jury could find that the negligence of defendant was the proximate cause of injury to the plaintiff. We therefore reject defendant's cross-assignment of error.

B. Contributory Negligence

[2]  On the basis of defendant's argument at trial that plaintiff failed to return to see Dr. Shull as ordered after 1 August 1977 and that plaintiff failed to consult an orthopedic specialist until 14 October 1977, the trial court submitted an issue of plaintiff's contributory negligence to the jury. In so doing, the trial court erred. We find no evidence in the record to establish a causal connection between plaintiff's actions and the injuries of which she complains.

Remembering that the burden is on the defendant — the movant on this particular issue — to show that plaintiff's injuries were proximately caused by her own negligence, we look first at plaintiff's allegations and then at the proof offered at trial. In her complaint, plaintiff specifically alleged that Dr. Shull negligently treated her between 17 April 1977 and 2 August 1977. And while plaintiff sought damages for pain, suffering and additional medical expenses incurred as a result of the 17 November 1977 open reduction surgery, the damages sought were based on Dr. Shull's alleged negligence *occurring prior to* 2 August 1977. Medical testimony at trial leads to a singular conclusion: In the course of Dr. Shull's treatment of plaintiff, there was a progressive slippage and an increase in displacement of the fracture; by 1 July 1977, according to the radiologist, the displacement was probably 100%, and the ends of the fracture were not touching at the site of the fracture.[3]

---

3. The radiologist testified:

    As to the degree of displacement illustrated by plaintiff's Exhibit No. 23, well, it's somewhat more than it was before. I think, probably, it's 100%. I think there's some overriding there. There is no apposition, I don't think there's any apposition between the actual fracture ends. I mean that the ends

Significantly, plaintiff kept all scheduled appointments with Dr. Shull between 18 April 1977 and 1 August 1977. Plaintiff's failure to return to Dr. Shull's office after 2 August 1977 and her failure to contact Dr. Anderson prior to 14 October 1977 did not proximately cause or contribute to the injuries she received prior to 1 August 1977. There is no evidence that the degree of deformity to her arm as established by x-rays on 1 August 1977, would have been decreased or lessened by anything she did prior to or after 2 August 1977.

Based on the foregoing reasons, the trial court erred in submitting the contributory negligence issue to the jury. Consequently, the Judgment is vacated and the case is remanded to the superior court for a new trial.

New trial.

Judge HEDRICK and Judge HILL concur.

of the fracture are not touching. Now the bones are touching but in a different position than where the actual fracture site is. It could go ahead and heal in that position.