JOSIE PHILLIPS TICE v. WILLIAM HALL

No. 8212SC720

(Filed 5 July 1983)

**Physicians, Surgeons and Allied Professions § 18— leaving sponge in patient's body—departing from standard of care**

    In an action to recover for injuries caused by a surgical sponge left inside plaintiff's abdominal cavity during surgery performed by defendant surgeon, the evidence would permit, but not compel, a jury finding that the standard of practice among surgeons with similar training and experience in the city in question was to conduct a search for the possible presence of surgical sponges in a patient's body before closing a surgical incision and that defendant did not conduct a search for sponges before closing plaintiff's incision but relied on a sponge count by operating room nurses who were not employed by defendant. G.S. 90-21.12.

    Judge BECTON dissenting.

APPEAL by plaintiff from *Bowen, Judge.* Judgment entered 11 February 1982 in CUMBERLAND County Superior Court. Heard in the Court of Appeals 12 May 1983.

Plaintiff brought this medical malpractice action against defendant to recover damages for injuries caused by a surgical sponge which was left inside plaintiff's abdominal cavity during surgery performed by defendant.

At the conclusion of all the evidence, the trial judge granted defendant's motion for directed verdict. Plaintiff appealed.

*Clark, Shaw, Clark & Bartelt, by Jerome B. Clark, Jr. and Teague, Campbell, Conely & Dennis, by John W. Campbell, for plaintiff.*

*Anderson, Broadfoot, Anderson, Johnson & Anderson, by Hal W. Broadfoot, for defendant.*

WELLS, Judge.

The question we decide in this case is whether plaintiff's evidence was sufficient to raise a jury issue on a violation of the standard of care incorporated in G.S. 90-21.12, which provides:

    In any action for damages for personal injury or death arising out of the furnishing or the failure to furnish profes-

sional services in the performance of medical, dental, or other health care, the defendant shall not be liable for the payment of damages unless the trier of the facts is satisfied by the greater weight of the evidence that the care of such health care provider was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the alleged act giving rise to the cause of action.

We answer the question in the affirmative and reverse the judgment of the trial court.

Our appellate courts have held that the standard of care adopted in G.S. 90-21.12 reflects the decisional law of our courts, *Thompson v. Lockert,* 34 N.C. App. 1, 237 S.E. 2d 259, *disc. rev. denied,* 293 N.C. 593, 239 S.E. 2d 264 (1977), and imposes a standard of care known as the "same or similar community rule." *Id.* Usually, expert testimony is required to establish the standard, to show its negligent violation, and to show that such negligent violation was the proximate cause of the injury complained of. *Ballenger v. Crowell,* 38 N.C. App. 50, 247 S.E. 2d 287 (1978); *see also Tripp v. Pate,* 49 N.C. App. 329, 271 S.E. 2d 407 (1980).

The evidence in this case must be reviewed in accordance with well-established and recognized rules applicable to motions for a directed verdict.

A motion by a defendant for a directed verdict under G.S. 1A-1, Rule 50(a) of the Rules of Civil Procedure tests the legal sufficiency of the evidence to take the case to the jury and support a verdict for the plaintiff. On such a motion, plaintiff's evidence must be taken as true and considered in the light most favorable to the plaintiff, giving plaintiff the benefit of every reasonable inference to be drawn therefrom. A directed verdict for the defendant is not properly allowed unless it appears as a matter of law that a recovery cannot be had by the plaintiff upon any view of the facts which the evidence reasonably tends to establish. *Manganello v. Permastone, Inc.,* 291 N.C. 666, 231 S.E. 2d 678 (1977); *Everhart v. LeBrun,* 52 N.C. App. 139, 277 S.E. 2d 816 (1981). If, when so viewed, the evidence is such that reasonable minds could differ as to whether the plaintiff is entitled to recover, a

directed verdict should not be granted and the case should go to the jury. *Insurance Co. v. Cleaners*, 285 N.C. 583, 206 S.E. 2d 210 (1974). On such a motion made at the close of all the evidence, any of defendant's evidence which tends to contradict or refute plaintiff's evidence is not to be considered, but the plaintiff is entitled to the benefit of defendant's evidence which is favorable to plaintiff, *Overman v. Products Co.*, 30 N.C. App. 516, 227 S.E. 2d 159 (1976), or which tends to clarify plaintiff's case, *Home Products Corp. v. Motor Freight, Inc.*, 46 N.C. App. 276, 264 S.E. 2d 774, *disc. review denied*, 300 N.C. 556, 270 S.E. 2d 105 (1980).

*Koonce v. May*, 59 N.C. App. 633, 298 S.E. 2d 69 (1982).

The trial court should deny motions for directed verdict . . . when, viewing the evidence in the light most favorable to the plaintiff and giving the plaintiff the benefit of all reasonable inferences, it finds " 'any evidence more than a scintilla' to support plaintiff's prima facie case in all its constituent elements."

*Hunt v. Montgomery Ward*, 49 N.C. App. 642, 272 S.E. 2d 357 (1980).

We now review the evidence in this case in accordance with the above-stated rules.

Plaintiff testified that she was a resident of Cumberland County, where she has resided for about 30 years. On 8 September 1976, defendant William Hall performed surgery on plaintiff at Cape Fear Valley Hospital to repair a hiatal hernia. Plaintiff had been referred to Dr. Hall by her family doctor, Dr. Izurieta. Following her surgery, plaintiff remained in the hospital for about 17 days. After plaintiff's surgery, plaintiff visited Dr. Hall in his office in Fayetteville on a number of occasions, complaining of pain and discomfort in the area of her body where the surgery was performed. Dr. Hall gave plaintiff various responses as to the cause of her discomfort, but provided no specific treatments. Plaintiff visited Dr. Izurieta frequently during 1977, 1978, and 1979, complaining of pain and discomfort. In September 1979, Dr. Izurieta arranged for a radiological examination of plaintiff. The examination disclosed a surgical sponge in plaintiff's body. Plaintiff received a telephone call from defendant, who was

then residing in Tulsa, Oklahoma, defendant saying to plaintiff that Dr. Izurieta had called him and that when Dr. Izurieta mentioned plaintiff's name, he (defendant) knew "what happened," that when defendant did plaintiff's surgery, a sponge was "left inside." As a result of the circumstances, plaintiff underwent surgery by Harold Newman, M.D., on 20 November 1979. Dr. Newman removed the sponge.

Dr. Newman testified that he was a medical doctor, practicing in surgery in Fayetteville since 1964. He was recognized as an expert witness. Dr. Newman's testimony was, in summary, as follows. Dr. Hall was practicing surgery in Fayetteville when Dr. Newman began practicing in 1964; they practiced together, but were not practicing together in 1976. Dr. Newman knew the training and experience of Dr. Hall; such training and experience was similar to Dr. Newman's. On 20 November 1979, he performed surgery on plaintiff to remove a "foreign substance" disclosed by x-ray. He found a mass of tissue near and involving plaintiff's spleen, near the site where a hiatal hernia operation would take place. The tissue removed by Dr. Newman included the remains of a surgical sponge. It was expectable that plaintiff would experience discomfort from the presence of the sponge "within her." On the standard of practice as to use of sponges during surgical procedures, Dr. Newman testified:

> It is in accordance with my standards of practice to make a systematic search before closing the incision in an operation. It is in accordance with my standards of practice to find and remove all sponges before sewing up a patient. It was also in accordance with my standards in 1976. There was no purpose to be served by leaving a sponge in Mrs. Tice in connection with her hiatal hernia.

On cross-examination, Dr. Newman testified as to the use of sponges in surgical procedures as follows:

> [I]t is conceivable that during the course of an operation the surgeon could run out of sponges. It does happen. If it happens the hospital personnel, the circulator (a nurse who is not what they call a sterile nurse) gets the additional sponges. She is on the staff of the hospital.
>
>        . . .

When I come into the operating room for surgery as I did in the case of Mrs. Tice, the sponges are already there. I did not count them before they came out of the sterile supply. When I go into the operating room, by tradition, I know how many sponges are there. I do not count them. There is a traditional number that is put on each lap pack. The sponges are first counted before the operation starts. The instrument nurse and the circulator nurse count them. They frequently do the count in unison. They write the count down on a pad or a note. It is spoken of as the sponge count. There are notes kept in the operating room by the nurses. . . .

The next usual sponge count is done just prior to the starting of the closure of the wound. This was so in the 1976 and 1979 surgeries of Mrs. Tice. At that point the operation is basically over with. At that point I am ready to close up.

The most inner layer is called the peritoneum. It is a lining of the abdominal cavity. That is the first thing that is closed. The first count is taken before the peritoneum is closed. As soon as you let the operating room circulator know that you are ready to complete the operation, she then proceeds with the sponge count. She tells you the count is correct. The surgeon says, "I am ready to close." It is then she proceeds with this sponge count. She says, "I have a correct sponge count," or something to that effect. At that point the peritoneum is closed.

The next step is to close the next layer. . . . At that point, there is another count usually assisted by the instrument nurse, there are two of them doing it. After making the count in the fascia, she says "Dr. Newman, I have another correct count." I close the fascia at that point. There is a third layer which is just in front of or anterior to the fascia. When we get to that third layer there is another sponge count by the instrument nurse and the circulator nurse together. This is done after the surgeon has announced that he is ready for the third closure. After the sponge count, the nurse again indicates that they have a correct sponge count and the third layer is then closed. The next closing is the skin. There is no sponge count related to that. There are three sponge counts by two nurses in the employ of the hos-

pital and that terminates the matter unless there is something missing or something wrong.

I have never closed a peritoneum if the nurse reported an incorrect count. If the same has applied as to the second layer, the fascia, the same applies to the third layer. . . . When I am getting ready to close the peritoneum, I do not participate with the nurses in the sponge count. . . . When I come to the third level, before coming out altogether, I do not physically contact those sponges and participate in that count. I have no involvement or contact with those sponges. When the sponge count is given to me by the person that gives it at the fascia when I am ready to close the peritoneum, I rely on that count. When I come up to the fascia in the level of the human body and getting ready to close that count and I tell the nurses and they do a sponge count and report it to me. Yes, I rely on that sponge count. When I come to the second and third level getting ready to close and announce that I am ready the nurses make a sponge count and report it back to me. If they report the sponge count is correct I rely on that count. If at any point in that three-pronged coming out, so to speak, a nurse or a counter reports that they do not have a correct sponge count, I do not close. If the sponge count is not correct they recount again to make sure they are counting correctly. If they turn up the error they stop and go forward. If they don't turn up the error they start looking for a sponge. One could have dropped on the floor or one could be stuck under some instruments, some of the sponges that are no longer used are taken off of the "field," so to speak, and they can be—there is usually some kind of arrangement, the sponge—two could be stuck together. They could be tucked down under one of the drapings of the sheet or the surgery or the sheets or drapery. Something like that could have happened.

. . .

I have never sent a patient back to the recovery room knowing that the sponge count was incorrect. The standards of care among surgeons with my background, training and experience in similar circumstances under similar conditions at Cape Fear Valley Hospital in 1976, in an operation like we

are talking about, permitted the operating surgeon to rely on the sponge count given to them by the nurses as correct. He would rely on that count. As a matter of fact in the operation which I did on Mrs. Tice in 1979 to remove the sponge, I relied on the sponge count that the counting people did at that time. The sponge count that was made at that time is the type that we have just indicated a few minutes ago.

It is not uncommon to miss a sponge. A sponge is not too difficult to lose within the cavities of the human body. They can be misplaced fairly easily. Being a gauze type material, they can and do assume the makeup that is in there and the mixture of the fluids and so on. They assume the coloration of those fluids. By virtue of that, they can become camouflaged and that is one of the reasons they can be missed in the procedure.

Yes, during the manipulation of surgery the sponges can be shifted around and during the hiatal hernia surgery itself, it is necessary to make some shifts in the  organs within the cavity. In fact, the stomach itself is shifted.

Yes, I learned before I did the 1979 operation on Mrs. Tice that the sponge count had been reported to Dr. Hall in 1976 as correct and made a note of that in my record. It is my recollection that I was told the sponge count on the previous operation was correct.

On re-direct examination, Dr. Newman testified:

Yes, I testified earlier that in accordance with my standard of practice in 1976, I conducted a systematic search within the patient before I sewed them up and, in accordance with my standard of practice, I do a search for all sponges before sewing up the patient. I do that notwithstanding the sponge count.

At the close of plaintiff's evidence, the trial court reserved judgment on defendant's motion for a directed verdict. Dr. Hall testified on his own behalf as to surgical standards, practice, and procedures, in pertinent part, as follows:

The average incision is five to six inches in length. It goes all the way down through the four layers of the abdomi-

nal wall. At that particular stage of the operation you put in surgical retractors, and those surgical retractors are lined with sponges so that they will not damage the patient's tender skin and muscles. The retractors are made of stainless steel. You line the entire cavity with sponges before you put the retractor in to open up the abdomen as much as possible. This is to protect the patient's tender skin and muscles from the stainless steel. The sponges I just mentioned are used for other purposes in the abdominal surgery. They are used to line other retractors that you also have to put in after this particular retractor has been put in. You will have a retractor in to hold the liver over and out of the way and they also line that retractor and then sponges are put in to hold the stomach to one side, the liver to another, the intestines down and the diaphragm up. So, there are sponges in every direction.

As the operation gets underway and after you have got everything visualized, which takes a fair amount of time, then the sponges are used to soak up irrigating solutions that you would use within a patient's body or they are used to soak up blood and serum, you know, that has accumulated as part of the operation and they are used also against organs that begin to ooze because of the nice warm sponge laid against an organ sometimes will help the oozing to stop. The sponges take on the coloration of whatever is adjacent to them in the way of the fluid or blood or irrigating solutions. I am sure there are records where maybe a hundred and fifty sponges have been used but I would say in the average hiatal hernia maybe thirty sponges.

You have absolutely no visibility once the incision has been made, because, as I brought out, the hernia is on the back side of the patient and up underneath the ribs and so, you have to develop visibility. You put in sponges to pack off the liver to the left and to the stomach to the right and the intestines below and the diaphragm above. These sponges come from the operating room nurses. They are put in there by the entire team meaning the first assistant puts sponges in, the surgeon also puts sponges in and the first assistant and second assistant would also be putting sponges in. Everybody takes sponges out. The scrub nurse also handles

sponges by handing them to the first assistant. The sponges are counted before the patient is brought to the operating room. They are counted by the nursing team that is delegated with that responsibility for that particular part of the surgical procedure.

The nursing team is employed by Cape Fear Valley Hospital. I do not engage in any sponge counting at the time the sponges are brought into the operating room. When I come into the operating room to do the surgery I do not know how many sponges are there. As the operation is finished, the two designated nurses, make the count, meaning the circulating nurse and the scrub nurse.

Once I have examined the patient inside *and looked at all the organs to make sure there is no foreign body within the patient,* I say that I am ready to close the patient, I say this to the circulating nurse. She puts the part of the operation in motion whereby she gets with the scrub nurse and they leave me completely and she takes the sponge count in unison with scrub nurse. That is usually done behind my back or else in one area of the operating room that the operation is not going on so it will not disturb the surgeons. While those people are engaged in the sponge count, I am in the process of getting the proper suture to close the peritoneum, which is the first layer of the lining of the abdominal cavity and at the same time having conversation between the anesthetist in bringing this patient out of this very deep state of consciousness back to life.

. . .

Q. Dr. Hall, do you have an opinion, as a medical expert practicing surgery in the Fayetteville area in September of 1976, as to whether or not the standards of care prevailing at that time among general surgeons, having a similar background and a similar amount of training in practicing here, permitted a general surgeon to close a patient upon receiving a correct sponge count? First of all, do you have such an opinion?

A. Yes.

Q. What is that opinion?

A. That is the only procedure that you can function with in closing the patient. It has to be carried out.

Q. State whether or not, Dr. Hall, in 1976, on the 8th day of September, 1976, when you begin or preparatory to your closing the fascia of Mrs. Tice, did you rely on the sponge count reported to you at that time?

A. Yes. I did.

Q. Did you rely on the sponge count reported to you at the time of reaching the fascia?

A. I did.

Q. Did you rely on the sponge count reported to you at the time of reaching the subcutaneous tissue?

A. Yes.

Q. And state whether or not, Dr. Hall, the standard of care prevailing at that time we've just discussed, in your opinion as a medical expert, permits you to rely on that sponge count then reported to you?

A. Yes. That goes throughout the entire United States. That is the same procedure every place. (Emphasis supplied.)

We are persuaded that the evidence in this case would permit, but not compel, a jury to find that the standard of practice among surgeons with similar training and experience in Fayetteville was to conduct a search for the possible presence of surgical sponges in a patient's body before closing a surgical incision. Defendant strongly contends that the evidence shows that the standard of practice in such procedures is for the surgeon to rely on the sponge count provided by operating room nurses, persons not employed by the surgeon. While such evidence is certainly capable of persuading the trier of facts toward defendant's position, the testimony of both Dr. Newman and Dr. Hall was that they followed the practice of conducting a search or looking for sponges (or foreign bodies) before closing, allowing the jury to find that the sponge count provided by the nurses is but one of the practices relied on by surgeons to avoid the risk of leaving a sponge in the incision.

On the question of negligent violation of the standard established by the evidence, plaintiff is entitled to rely on the doctrine of *res ipsa loquitur*. Our appellate courts have consistently held that the leaving of a foreign object in a patient's body during a surgical procedure is in itself some evidence of negligence. *Shearin v. Lloyd*, 246 N.C. 363, 98 S.E. 2d 508 (1957); *Hyder v. Weilbaecher*, 54 N.C. App. 287, 283 S.E. 2d 426, *disc. rev. denied*, 304 N.C. 727, 288 S.E. 2d 804 (1981), and cases cited and discussed therein. We note also that in this case, plaintiff's proof was aided by defendant's own testimony that he relied on the sponge count before closing plaintiff's incision, allowing the jury to find that he did not conduct a search for sponges before closing the incision.

There is no question as to the quality of plaintiff's evidence as to the proximate cause of her injuries complained of in this action. The sponge left in her was the villain.

In cases such as this, we deem it appropriate to once again emphasize the procedural point that

[w]here the question of granting a directed verdict is a close one, the better practice is for the trial judge to reserve his decision on the motion and allow the case to be submitted to the jury. If the jury returns a verdict in favor of the moving party, no decision on the motion is necessary and an appeal may be avoided. If the jury finds for the nonmoving party, the judge may reconsider the motion and enter a judgment notwithstanding the verdict under G.S. 1A-1, Rule 50(b), provided he is convinced the evidence was insufficient. On appeal, if the motion proves to have been improperly granted, the appellate court then has the option of ordering entry of the judgment on the verdict, thereby eliminating the expense and delay involved in a retrial.

*Manganello v. Permastone, Inc., supra; Koonce v. May, supra.*

For the reasons stated, we hold that the trial court erred in granting defendant's motion for a directed verdict and that there must be a new trial.

Reversed and remanded.

Judge BECTON dissents.

Judge EAGLES concurs.

Judge BECTON dissenting.

While I have not hesitated to hold doctors to the appropriate standard of care when that standard has been clearly established, *see Howard v. Piver,* 53 N.C. App. 46, 279 S.E. 2d 876 (1981); *Powell v. Shull,* 58 N.C. App. 68, 293 S.E. 2d 259, *pet. for disc. rev. denied,* 306 N.C. 743, 295 S.E. 2d 479 (1981); and *Hyder v. Weilbaecher,* 54 N.C. App. 287, 283 S.E. 2d 426, *disc. rev. denied,* 304 N.C. 727, 288 S.E. 2d 804 (1981), I am not persuaded that the evidence in this case shows that Dr. Hall violated the standard of practice among surgeons with similar training and experience in similar communities when he relied on the sponge count given him by the nurses. Dr. Hall clearly violated Dr. Newman's standard of practice of making "a systematic search before closing the incision in an operation," but Dr. Newman's standard is not the applicable standard.

Because the evidence shows that the standard of practice is for the surgeon to rely on the sponge counts provided by operating room nurses and that Dr. Hall did that in the case *sub judice,* I believe the trial court correctly granted the defendant's motion for a directed verdict.